Iris I. VARNER, et al., Plaintiffs–
Appellees,

and

United States of America,
Intervenor–Appellee,

v.

ILLINOIS STATE UNIVERSITY, et
al., Defendants–Appellants.

No. 97–3253.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 26, 1998.

Decided July 21, 1998.

Rehearing and Suggestion for Rehearing
En Banc Denied Oct. 13, 1998.

Martha A. Mills (argued), Joel J. Bellows, Bellows & Bellows, Chicago, IL, William R. Kohlhase, Miller, Hall & Triggs, Peoria, IL, for Plaintiffs–Appellees.

Arthur B. Cornell, Jr., Griffin, Winning, Cohen & Bodewes, Springfield, IL, Mark S. Mester (argued), Latham & Watkins, Chicago, IL, for Defendants–Appellants.

Jessica Dunsay Silver, Seth M. Galanter (argued), Department of Justice, Civil Rights Div., Appellate Section, Washington, DC, Isabelle K. Pinzler, Office of Atty. Gen., Champaign, IL, for Intervenor.

Before BAUER, WOOD, JR., and FLAUM, Circuit Judges.

FLAUM, Circuit Judge.

[1] This appeal concerns the confluence of two recent, significant Supreme Court decisions, *City of Boerne v. Flores*, —— U.S. ——, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), and *Seminole Tribe v. Florida*, 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996). The plaintiffs represent a class comprised of all tenured or tenure-track female faculty at

Illinois State University ("ISU") from the 1982–83 academic year to the present. In 1995, they filed a complaint against ISU, four of its officials, its Board of Regents, and ten members of the Board (collectively, "the University"). The plaintiffs alleged violations of the Equal Pay Act, 29 U.S.C. § 206(d), and Title VII, 42 U.S.C. § 2000e, and sought injunctive and monetary relief, including compensatory damages for intentional violations of Title VII under 42 U.S.C. § 1981a. The University, which is concededly a state entity, moved to dismiss the Equal Pay Act claim, as well as that part of the Title VII claim seeking compensatory damages. The University argued that its Eleventh Amendment immunity served as a bar to federal jurisdiction with respect to these claims. The district court denied the University's motion to dismiss. *See* 972 F.Supp. 458 (C.D.Ill.1997), and 986 F.Supp. 1107 (C.D.Ill. 1996).

■ The University appealed the district court's denial of its Eleventh Amendment immunity defense. We granted the United States' motion to intervene to defend the constitutionality of this application of federal law to the States. We have jurisdiction over this interlocutory appeal pursuant to 28 U.S.C. § 1291 under the collateral order doctrine. *See Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.,* 506 U.S. 139, 145, 113 S.Ct. 684, 121 L.Ed.2d 605 (1993). We affirm the district court's decision in all respects.

## I.

■ The Eleventh Amendment provides, "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const.Amend. XI. While the amendment by its terms appears to limit only the federal courts' Article III diversity jurisdiction, the Supreme Court has long "understood the Eleventh Amendment to stand not so much for what it says, but for the presupposition … which it con-

firms." *Blatchford v. Native Village of Noatak,* 501 U.S. 775, 779, 111 S.Ct. 2578, 115 L.Ed.2d 686 (1991). The text of the amendment, narrowly written to overrule the Supreme Court's decision in *Chisholm v. Georgia,* 2 U.S. (2 Dall.) 419, 1 L.Ed. 440 (1793), *see Seminole Tribe,* 517 U.S. at 67–70, 116 S.Ct. 1114, stands for the larger proposition, inherent in our federal system, that each state remains a sovereign entity. *See id.* at 54, 116 S.Ct. 1114 ("For over a century we have reaffirmed that federal jurisdiction over suits against unconsenting States 'was not contemplated by the Constitution when establishing the judicial power of the United States.'") (quoting *Hans v. Louisiana,* 134 U.S. 1, 15, 10 S.Ct. 504, 33 L.Ed. 842 (1890)). Accordingly, the States enjoy an immunity from suit in federal court by all private parties for all causes of action, including suits arising under federal statutes. *See, e.g., Doe v. University of Ill.,* 138 F.3d 653, 656–57 (7th Cir.1998). State sovereign immunity, however, is not absolute: A state may consent to suit in federal court [1] and, under certain circumstances, Congress may abrogate a state's Eleventh Amendment immunity.

■ Congress may constitutionally abrogate the States' Eleventh Amendment immunity under a particular statute if it both unequivocally expresses its intent to do so and acts pursuant to a valid exercise of power. *See Seminole Tribe,* 517 U.S. at 55, 116 S.Ct. 1114. With respect to the latter inquiry, *Seminole Tribe* rejected the notion that the Indian Commerce Clause, U.S. Const. art. I, § 8, cl. 3, confers upon Congress the power to abrogate the States' Eleventh Amendment immunity. *See id.* at 71–73, 116 S.Ct. 1114 ("The Eleventh Amendment restricts the judicial power under Article III, and Article I cannot be used to circumvent the constitutional limitations placed upon federal jurisdiction."). In so holding, the Court also explicitly overruled *Pennsylvania v. Union Gas Co.,* 491 U.S. 1, 109 S.Ct. 2273, 105 L.Ed.2d 1 (1989), in which a plurality of the Court held that the Interstate Commerce Clause, U.S. Const. art. I, § 8, cl. 3, gave Congress the power to abrogate state sover-

---

1. No party contends that Illinois has consented to suit in the instant case.

eign immunity. *See* 517 U.S. at 63–66, 116 S.Ct. 1114.

The Court in *Seminole Tribe* reaffirmed, however, that valid legislation pursuant to § 5 of the Fourteenth Amendment could serve as a basis for abrogating state sovereign immunity.[2] *See id.* at 59–60, 63–66, 116 S.Ct. 1114 (discussing *Fitzpatrick v. Bitzer,* 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976)) ("*Fitzpatrick* was based upon a rationale wholly inapplicable to the Interstate Commerce Clause, viz., that the Fourteenth Amendment, adopted well after the adoption of the Eleventh Amendment and the ratification of the Constitution, operated to alter the pre-existing balance between state and federal power achieved by Article III and the Eleventh Amendment."). Thus, "[e]ven after *Seminole Tribe,* 'the Eleventh Amendment does not insulate the states from suits in federal courts to enforce federal statutes enacted under the authority of the Fourteenth Amendment.'" *Goshtasby v. Board of Trustees of the Univ. of Ill.,* 141 F.3d 761, 766 (7th Cir.1998) (quoting *Crawford v. Indiana Dep't of Corrections,* 115 F.3d 481, 487 (7th Cir.1997)).

The University raises a number of arguments contending that Congress did not validly abrogate the States' Eleventh Amendment immunity when it passed the Equal Pay Act. First, the University asserts that the Equal Pay Act does not contain a clear and unequivocal expression of Congress's intent to abrogate the States' immunity. Second, the University posits that Congress passed the Equal Pay Act pursuant to its power under the Commerce Clause and not pursuant to its power under § 5. The University argues that, following *Seminole Tribe,*

Commerce Clause legislation cannot validly abrogate the States' immunity from suit in federal court. Third, the University asserts that the Equal Pay Act does not constitute valid legislation under Congress's § 5 power in any event. In this context, the University relies on the *Supreme Court's interpretation of § 5 in City of Boerne v. Flores,* — U.S. ——, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), in conjunction with the fact that the Equal Pay Act does not require proof of intentional discrimination to support a valid claim for relief. The University's Title VII argument is more narrow. It concedes that Title VII itself contains a clear statement of legislative intent to abrogate the States' immunity. *See Fitzpatrick,* 427 U.S. at 456, 96 S.Ct. 2666. However, the University argues that 42 U.S.C. § 1981a, which made available a compensatory damages remedy to Title VII plaintiffs, is a distinct statute from Title VII that does not contain its own statement of congressional intent to abrogate the States' Eleventh Amendment immunity. We address these arguments in turn.

## II. The Equal Pay Act

### A. Intent to Abrogate

In deciding whether Congress unequivocally expressed its intent to abrogate the States' Eleventh Amendment immunity under the Equal Pay Act, it is helpful to consider the context and history of the statute. Congress passed the Equal Pay Act of 1963, Pub.L. No. 88–38, 77 Stat. 56 (codified at 29 U.S.C. § 206(d)), as an amendment to the Fair Labor Standards Act of 1938 (FLSA), 29 U.S.C. § 201 to § 219. The Equal Pay Act, which prohibits wage disparities on the basis of sex,[3] therefore employs the same definitional

---

2. Section 5 of the Fourteenth Amendment provides, "The Congress shall have power to enforce, by appropriate legislation, the provisions of this article." This section enables Congress "to enforce" the Fourteenth Amendment's guarantees that no State shall "deprive any person of life, liberty, or property, without due process of law" or deny any person "the equal protection of the laws." U.S. Const. amend. XIV, § 1.

3. The Equal Pay Act provides in relevant part:

No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such em-

ployees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex. . . .

29 U.S.C. § 206(d)(1).

and enforcement provisions as do the over-time and minimum wage provisions of the FLSA. *See* 29 U.S.C. §§ 203, 206–07, 216; *see also Timmer v. Michigan Dep't of Commerce,* 104 F.3d 833, 838 n. 6 (6th Cir.1997). In 1966, Congress amended the FLSA's definition of "employer" to include state government workers employed in hospitals, institutions, or schools. See Pub.L. No. 89–601 § 102(b), 80 Stat. 831 (amending 29 U.S.C. § 203(d)). The Supreme Court subsequently held, however, that the 1966 amendment to the FLSA did not abrogate the States' immunity from suit in federal court. *See Employees v. Department of Pub. Health & Welfare,* 411 U.S. 279, 284–86, 93 S.Ct. 1614, 36 L.Ed.2d 251 (1973). As we have noted, *see Mueller v. Thompson,* 133 F.3d 1063, 1065 (7th Cir.1998), Congress responded to *Employees* by amending certain provisions of the FLSA in the Fair Labor Standards Amendments of 1974, Pub.L. No. 93–259, 88 Stat. 55, including its definitions of "employer," 29 U.S.C. § 203(d) & (x), and "employee," *id.* § 203(e)(2)(c), as well as its enforcement provision, *id.* § 216(b).[4]

Following the 1974 amendments to the FLSA, the term "employer" is defined to "include[ ] a public agency." 29 U.S.C. § 203(d). The statute in turn defines "public agency" to include "the government of a State or political subdivision thereof; any agency of … a State, or a political subdivision of a State." *Id.* § 203(x). The FLSA defines "employee" to include "any individual employed by a State, political subdivision of a State, or an interstate governmental agency." *Id.* § 203(e)(2)(C). Finally, the Act's private enforcement provision provides in pertinent part, "An action to recover the liability prescribed in either of the preceding sentences [including violations of § 206] may be maintained against any employer (*including a public agency*) in any Federal or State court

of competent jurisdiction by any one or more employees." *Id.* § 216(b) (emphasis added).

■ In light of the plain statutory language, which authorizes "employees" to sue "public agencies" in federal court for violations of the Equal Pay Act, we have little difficulty holding that Congress clearly expressed its intent to abrogate the States' Eleventh Amendment immunity when it amended § 216(b) in 1974. We have previously hinted at this holding in both *Mueller,* 133 F.3d at 1065, and *Ende v. Board of Regents,* 757 F.2d 176, 177 n. 3 (7th Cir. 1985), and we make it explicit today. In so doing, we join the other circuits that have examined this issue in the context of both the Equal Pay Act and the FLSA. *See Close v. New York,* 125 F.3d 31, 36 (2d Cir.1997) (FLSA); *Mills v. Maine,* 118 F.3d 37, 41–42 (1st Cir.1997) (FLSA); *Aaron v. Kansas,* 115 F.3d 813, 814–15 (10th Cir.1997) (FLSA); *Timmer,* 104 F.3d at 837–38 (Equal Pay Act); *Hale v. Arizona,* 993 F.2d 1387, 1391–92 (9th Cir.) (en banc) (FLSA), *cert. denied,* 510 U.S. 946, 114 S.Ct. 386, 126 L.Ed.2d 335 (1993).

While the University concedes that the Equal Pay Act creates a private cause of action for state employees, it argues that the statute does no more than permit those employees to sue the States in their own courts. *Compare, e.g., Welch v. Texas Dep't of Highways & Pub. Transp.,* 483 U.S. 468, 107 S.Ct. 2941, 97 L.Ed.2d 389 (1987) (holding that the Jones Act does not abrogate the States' Eleventh Amendment immunity), *with Hilton v. South Carolina Pub. Rys. Comm'n,* 502 U.S. 197, 112 S.Ct. 560, 116 L.Ed.2d 560 (1991) (holding that the Federal Employers' Liability Act, which provides the statutory remedial scheme for the Jones Act, creates a cause of action against state employers in their own courts). In this context, the University emphasizes that the statutory provisions discussed above do not contain any

---

4. While our recitation of the history of the Equal Pay Act is helpful in understanding the context of the statutory provisions at issue, this history in itself has no bearing upon our inquiry into whether Congress unequivocally expressed its intent to abrogate the States' Eleventh Amendment immunity. Rather, that intent must be made "unmistakably clear in the language of the statute." *Dellmuth v. Muth,* 491 U.S. 223, 227–28,

109 S.Ct. 2397, 105 L.Ed.2d 181 (1989); *see also, e.g., Hilton v. South Carolina Pub. Rys. Comm'n,* 502 U.S. 197, 204, 112 S.Ct. 560, 116 L.Ed.2d 560 (1991) ("Congressional intent to abrogate Eleventh Amendment immunity must be expressed in the text of the statute; the Court will not look to legislative history in making its inquiry.").

explicit references to the "Eleventh Amendment," or to "abrogation of state sovereign immunity." *See, e.g., Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 246, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985) ("A general authorization for suit in federal court is not the kind of unequivocal statutory language sufficient to abrogate the Eleventh Amendment."). We previously have concluded, however, that such "magic words" are unnecessary, because "that degree of explicitness is not required." *Davidson v. Board of Governors*, 920 F.2d 441, 443 (7th Cir.1990); *cf. Seminole Tribe*, 517 U.S. at 56–57, 116 S.Ct. 1114 (holding that, even though the statute at issue did not refer explicitly to the Eleventh Amendment, "the numerous references to the 'State' in the text of [the statute] make it indubitable that Congress intended through the Act to abrogate the States' sovereign immunity from suit"). Rather, as we stressed in *Davidson*, all that is necessary is that Congress make "its desire to override the states' sovereign immunity clear[ ]" from the language of the statute. 920 F.2d at 443.

We recently addressed a similar assertion of Eleventh Amendment immunity by the State of Illinois under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621–34, in *Goshtasby v. Board of Trustees of the University of Illinois*, 141 F.3d 761, 765–66 (7th Cir.1998). *Goshtasby* explicitly reaffirmed *Davidson's* rationale on this point. *See id.* Moreover, *Goshtasby* rejected the notion that *Seminole Tribe* altered in any way the traditional inquiry to determine whether Congress unequivocally expressed

its intent to abrogate. We concluded that "*Seminole Tribe* simply recycled [the] well-established verbiage in stating that Congress must be 'unmistakably clear.' The analysis was the same one federal courts have used for years." *Id.* at 766 (citations omitted). Thus, we conclude that Congress expressed its intent to abrogate the States' Eleventh Amendment immunity when it amended the Equal Pay Act in 1974.

### B. Power to Abrogate

■ But for the Supreme Court's holding in *Seminole Tribe*, our Eleventh Amendment inquiry into the Equal Pay Act would be complete, as the Equal Pay Act (along with the rest of the FLSA) clearly is within Congress's Commerce Clause powers. *See, e.g., Garcia v. San Antonio Metro. Trans. Auth.*, 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985); *Marshall v. City of Sheboygan*, 577 F.2d 1, 6 (7th Cir.1978). However, as we have discussed, *see supra* at 708–709, *Seminole Tribe* established that Congress may only abrogate the States' Eleventh Amendment immunity through legislation validly enacted pursuant to its § 5 enforcement powers.[5] Because we must determine whether "the Act in question [was] passed pursuant to a constitutional provision granting Congress the power to abrogate," *Seminole Tribe*, 517 U.S. at 59, 116 S.Ct. 1114, we therefore are required to consider two questions: (1) whether Congress, in applying the Equal Pay Act to the States, did so pursuant to its § 5 powers and, if so, (2) whether the Equal Pay Act is within Congress's § 5 powers, as inter-

5. Accordingly, all of the circuits to have addressed the issue following *Seminole Tribe* have held that the minimum wage and overtime provisions of the FLSA do not validly abrogate the States' Eleventh Amendment immunity. Those circuits have rejected, either explicitly or implicitly, the argument that the wage and overtime provisions serve a valid Fourteenth Amendment purpose. *See Powell v. Florida*, 132 F.3d 677, 678 (11th Cir.), *cert. denied*, —— U.S. ——, 118 S.Ct. 2297, 141 L.Ed.2d 158, 66 U.S.L.W. 3780 (1998); *Quillin v. Oregon*, 127 F.3d 1136, 1137 (9th Cir.1997); *Close v. New York*, 125 F.3d 31, 38 (2d Cir.1997); *Mills v. Maine*, 118 F.3d 37, 48–49 (1st Cir.1997); *Aaron v. Kansas*, 115 F.3d 813, 816–18 (10th Cir.1997); *Raper v. Iowa*, 115 F.3d 623, 624 (8th Cir.1997); *Wilson–Jones v. Caviness*, 99 F.3d 203, 208–11 (6th Cir.1996). In a case remanded to this Court by the Supreme

Court for reconsideration in light of *Seminole Tribe*, we implicitly reached the same holding. *See Mueller v. Thompson*, 133 F.3d 1063, 1064 (7th Cir.1997) (stating that, in light of *Seminole Tribe*, "[t]he only issue is whether Wisconsin has waived its Eleventh Amendment immunity from suit in federal court under the FLSA" and citing *Mills, Raper,* and *Wilson–Jones*). Three of these courts, though, expressly reserved the question of whether the Equal Pay Act validly serves a Fourteenth Amendment purpose. *See Mills*, 118 F.3d at 48; *Aaron*, 115 F.3d at 817; *Raper*, 115 F.3d at 624. Moreover, the Sixth Circuit, in holding that the Equal Pay Act validly abrogates the States' Eleventh Amendment immunity, noted that its holding was not in tension with its contrary holding in *Wilson–Jones*. *See Timmer v. Michigan Dep't of Commerce*, 104 F.3d 833, 842 (6th Cir.1997).

preted by the Supreme Court in *City of Boerne v. Flores,* — U.S. —, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997).

1. Whether Congress Exercised its § 5 Powers in Making the Equal Pay Act Applicable to the States

█ In *EEOC v. Elrod,* 674 F.2d 601, 604–09 (7th Cir.1982), we considered whether Congress had employed its § 5 enforcement powers when it amended the ADEA in 1974 to cover state employees.[6] Although we recognized that the 1974 amendments to the ADEA did not explicitly refer to Congress's § 5 powers, *id.* at 607–08, we did not believe that this fact was dispositive of our inquiry. Instead, we concluded that "the test of whether legislation is enacted pursuant to § 5 of the Fourteenth Amendment requires no talismanic intoning of the amendment. Rather, the inquiry is whether the *objectives* of the legislation are within Congress' power under the amendment." *Id.* at 608 (citation omitted). Because we concluded that the objectives of the 1974 amendments to the ADEA were "clearly tied to the guarantee of the Equal Protection clause of the Fourteenth Amendment," we held that Congress acted pursuant to its § 5 enforcement powers when it extended the ADEA's coverage to state and local government employees. *See id.* at 608–09.

We recently have had two opportunities to consider *Elrod's* rule, in *Doe v. University of Illinois,* 138 F.3d 653, 657–60 (7th Cir.1998), and in *Goshtasby v. Board of Trustees of the University of Illinois,* 141 F.3d 761, 766–68 (7th Cir.1998). In *Doe,* which considered the State of Illinois's Eleventh Amendment challenge to Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, we explicitly reaffirmed *Elrod's* analysis, stating that "[t]he appropriate question is, were 'the objectives of [Title IX] ... within Congress' power'" under the Fourteenth Amendment. 138 F.3d at 660 (alterations in original) (quoting *Elrod,* 674 F.2d at 608). Similarly, *Goshtasby,* which like *Elrod* addressed the ADEA, reaffirmed our holding in *Elrod,* concluding

that "the rule remains that Congress need not use magic words to exercise its enforcement power under § 5 of the Fourteenth Amendment." 141 F.3d at 768. *See also Doe,* 138 F.3d at 678 (Easterbrook, J., respecting denial of rehearing en banc) ("Sex discrimination by public schools is a subject within the legislative power under § 5 of the fourteenth amendment, and Congress need not catalog the grants of power under which it legislates; courts do not remand statutes for better statements of reasons.").

Both *Goshtasby* and *Doe* also rejected the argument, which the University raises in the instant case, that *Elrod's* rule contravenes the Supreme Court's cautionary language that "we should not quickly attribute to Congress an unstated intent to act under its authority to enforce the Fourteenth Amendment." *Gregory v. Ashcroft,* 501 U.S. 452, 469, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991) (quoting *Pennhurst State Sch. & Hosp. v. Halderman,* 451 U.S. 1, 16, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981)). We recognized in *Doe* that the inquiries involved in both *Gregory* and *Pennhurst* were not similar to our inquiry into whether Congress acted pursuant to § 5 in enacting legislation, the substantive reach of which was clear. Rather, we concluded, those cases concerned the substantive reach of statutory provisions and whether Congress intended to subject the States to mandatory obligations by enacting legislation pursuant to its § 5 powers. *See Doe,* 138 F.3d at 658 & n. 6; *see also Goshtasby,* 141 F.3d at 767–68. "In the present inquiry, by contrast, the intended result (of subjecting States to suit for violations of [the Equal Pay Act's] substantive provisions) is clear, and the grant of power under which Congress acted is at issue." *Doe,* 138 F.3d at 658. We therefore continue to adhere to the method of analysis set forth in *Elrod,* which is consistent with the long-recognized rule that "the constitutionality of action taken by Congress does not depend on recitals of the power which it undertakes to exercise." *Woods v. Cloyd W. Miller Co.,* 333 U.S. 138, 144, 68 S.Ct. 421, 92 L.Ed. 596 (1948); *see also EEOC v. Wyoming,* 460 U.S. 226, 243 n. 18,

---

**6.** These amendments to the ADEA, Pub.L. No. 93–259, 88 Stat. 74, were in fact included in the Fair Labor Standards Amendments of 1974—the same legislation that amended the FLSA. *See Elrod,* 674 F.2d at 605.

103 S.Ct. 1054, 75 L.Ed.2d 18 (1983) (recognizing that "Congress need [not] anywhere recite the words 'section 5' or 'Fourteenth Amendment' or 'Equal Protection'" in order to exercise its § 5 powers).

The Equal Pay Act, however, presents an additional wrinkle that prevents us from proceeding immediately to consider whether the objectives of the Act are within Congress's § 5 powers. The FLSA as originally enacted explicitly stated that the statute constitutes an exercise of Congress's Commerce Clause powers. *See* 29 U.S.C. § 202(b); *see also United States v. Darby*, 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609 (1941) (upholding the constitutionality of the FLSA as a valid exercise of Congress's Commerce Clause powers). Moreover, when Congress amended the FLSA in 1963 by passing the Equal Pay Act, it explicitly stated that it was relying on its authority to regulate interstate commerce. See Pub.L. No. 8838, § 2(b), 77 Stat. 56, 56. This history would be unexceptional by itself, as it is consistent with Congress's pattern of enacting civil rights statutes under the Commerce Clause to regulate private conduct, as mandated by the holding of the Civil Rights Cases, 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835 (1883), and later amending those statutes pursuant to its § 5 authority to encompass government conduct as well. *See, e.g., Elrod*, 674 F.2d at 606–08 (discussing this pattern with respect to Title VII and the ADEA).

The University contends, however, that Congress made a similarly express statement that it was exercising its powers under the Commerce Clause when it extended the FLSA to the States through the Fair Labor Standards Amendments of 1974. According to the University's argument, the Equal Pay Act is unlike the ADEA, in which Congress left the source of its power unstated when it extended the statute's coverage to the States. *See Goshtasby*, 141 F.3d at 767. Therefore, the University argues, the inquiry mandated by *Elrod*—whether the objectives of the statute are within Congress's § 5 powers—is simply inapplicable to this case. Rather, the University believes that we should take Congress at its word and definitively conclude that the 1974 amendments to the Equal Pay Act were enacted solely pursuant to its Commerce Clause powers.

As an initial matter, we note that another court of appeals has rejected the premise that Congress explicitly relied upon its Commerce Clause powers when it extended the Equal Pay Act's protections to the States. The Sixth Circuit, in addressing the identical question that is before us today, extensively analyzed the legislative history of the Fair Labor Standards Amendments of 1974 [7] and reaffirmed its prior holding that "Congress did not expressly state the constitutional basis of its extension of the FLSA to the States in 1974." *Timmer v. Michigan Dep't of Commerce*, 104 F.3d 833, 838 (6th Cir.1997). The court in Timmer noted that the report of the Senate Committee on Labor and Public Welfare, S.Rep. No. 93–690, 93d Cong., 2d Sess. 24 (1974), merely indicated the Committee's belief that "it had the power to extend the FLSA to the States under the Commerce Clause." [8] *Timmer*, 104 F.3d at 838–39 n. 7.

---

7. As our analysis in *Elrod* made clear, we must focus upon the particular legislation that extended a statute's coverage to the States, as opposed to the original statute itself, when determining the source of Congress's power. *See Elrod*, 674 F.2d at 604–08 (considering the 1974 amendments to the ADEA, as opposed to the original legislation enacted in 1967). *Accord, e.g., Mills v. Maine*, 118 F.3d 37, 43 (1st Cir.1997) (considering the 1974 amendments to the FLSA as opposed to the original legislation); *Timmer v. Michigan Dep't of Commerce*, 104 F.3d 833, 838 n. 7 (6th Cir.1997) ("[T]he court properly focused on the 1974 amendments as opposed to the 1963 version of the Equal Pay Act. Although the 1974 legislation was an amendment to an already existing act, it was nevertheless a separate act of Congress.").

8. The report states, in part:

> The Committee believes that there is no doubt that the activities of public sector employers affect interstate commerce and therefore that the Congress may regulate them pursuant to its power to regulate interstate commerce. Without question, the activities of government at all levels affect commerce.

S.Rep. No. 93–690, 93d Cong., 2d Sess. 24 (1974). *See also* H.R.Rep. No. 93–913, 93d Cong., 2d Sess. 2 (1974) ("It is hereby declared to be the policy of this Act, through the exercise by Congress of its power to regulate commerce among the several States and with foreign nations, to correct and as rapidly as practicable to eliminate the conditions above referred to....").

The Equal Pay Act, which Congress designated as severable from the other protections of the FLSA, *see* 29 U.S.C. § 219, is mentioned only once in the Senate Committee's 116–page report, in a discussion of the FLSA's historical background. *See* S.Rep. No. 93–690, supra, at 6. Indeed, the relevant legislative history indicates that Congress concentrated primarily upon extending the FLSA's minimum wage and overtime provisions when it passed the Fair Labor Standards Amendments of 1974. *See id.; see also Timmer*, 104 F.3d at 846 n. 2 (Boggs, J., dissenting) ("The items debated were primarily the minimum wage and overtime provisions."); *cf. Elrod*, 674 F.2d at 605 (noting that "[l]ittle legislative history exists on the ADEA amendment, . . . because the breadth and significance of the amendments to the FLSA overshadowed the ADEA amendment"). Thus, we do not accept the University's contention, which is solely based upon a murky legislative history, that Congress expressly relied upon its Commerce Clause powers in extending the Equal Pay Act to the States. *Accord Mills*, 118 F.3d at 44 ("[O]ne cannot read Congress' statement regarding the Act's validity under the Commerce Clause to indicate that Congress intended to exclude other applicable constitutional bases for the Act.") (quotations and alteration omitted); *Timmer*, 104 F.3d at 838–39 n. 7 ("We believe that this legislative history falls far short of an 'express statement' of congressional intent.").

Because we are unconvinced that Congress expressly declared its intention to proceed solely pursuant to its Commerce Clause powers, we conclude that *Elrod's* analysis controls the present inquiry. Pursuant to this analysis, we have little difficulty in concluding that the objectives of the Equal Pay Act

were within Congress's powers under the Fourteenth Amendment.[9] As we have discussed, see supra at 709 & n. 3, the purpose of the Equal Pay Act is to prohibit arbitrary sex-based wage disparities. Prohibiting "arbitrary, discriminatory government conduct . . . is the very essence of the guarantee of 'equal protection of the laws' of the Fourteenth Amendment." *Elrod*, 674 F.2d at 604. Thus, we conclude that the Equal Pay Act constitutes an exercise of Congress's § 5 enforcement powers.[10]

2. Whether The Equal Pay Act is Within Congress's § 5 Enforcement Powers

 The University argues that Congress exceeded its power to enforce the Fourteenth Amendment when it extended the protections of the Equal Pay Act to the States. In this context, the University relies on the fact that the Equal Pay Act does not require proof of an employer's discriminatory purpose. *See Fallon v. Illinois*, 882 F.2d 1206, 1213 (7th Cir.1989) (recognizing that "the Equal Pay Act creates a type of strict liability in that no intent to discriminate need be shown") (quotation omitted); *see also Pollis v. New Sch. for Soc. Research*, 132 F.3d 115, 118 (2d Cir.1997). Because claims of discrimination under the Fourteenth Amendment require proof of purposeful discrimination, *see, e.g., Personnel Adm'r v. Feeney*, 442 U.S. 256, 274, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979), the University contends that the Equal Pay Act is not within Congress's power "to enforce, by appropriate legislation, the provisions" of the Fourteenth Amendment. U.S. Const. amend. XIV, § 5. We previously have addressed similar challenges to Title VII's imposition of disparate impact liability. *See Liberles v. County of Cook*, 709 F.2d

9. We note that this conclusion is not dispositive of the issue of whether the extension of the Equal Pay Act to the States is constitutionally-valid legislation, which we consider *infra* at 714–717.

10. Two other courts of appeals, in addition to the Sixth Circuit in Timmer, have arrived at the same conclusion. *See Usery v. Charleston County Sch. Dist.*, 558 F.2d 1169, 1171 (4th Cir.1977); *Usery v. Allegheny County Inst. Dist.*, 544 F.2d 148, 155 (3d Cir.1976), *cert. denied*, 430 U.S. 946, 97 S.Ct. 1582, 51 L.Ed.2d 793 (1977).

Those courts both rejected Tenth Amendment challenges to the Equal Pay Act under the then-prevailing rule of *National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), by holding that the Equal Pay Act was enacted pursuant to Congress's § 5 powers. We applied a different rationale to reject a Tenth Amendment challenge to the Equal Pay Act in *Marshall v. City of Sheboygan*, 577 F.2d 1 (7th Cir.1978), but we expressly reserved the question of whether the statute was also a proper exercise of Congress's § 5 powers. *See id.* at 6 n. 19.

1122, 1135 (7th Cir.1983); *United States v. City of Chicago,* 573 F.2d 416, 422–24 (7th Cir.1978). We rejected those challenges, holding that the prohibition of policies that had a discriminatory impact was "plainly adapted" to the end of "enforc[ing] the anti-discrimination provisions of the Equal Protection Clause." *Id.* at 423. The University argues, however, that the Supreme Court's holding in *City of Boerne v. Flores,* — U.S. ——, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), altered our prior understanding of Congress's Fourteenth Amendment enforcement powers and warrants a different result in the instant case.

In *City of Boerne,* the Supreme Court addressed the constitutionality of the Religious Freedom Restoration Act (RFRA), 42 U.S.C. §§ 2000bb to 2000bb–4. RFRA was a legislative response to the Supreme Court's decision in *Employment Division v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), in which the Court had held that the First Amendment's Free Exercise Clause did not require the States to provide exceptions from neutral, generally applicable laws that significantly burden religious practices. *See id.* at 887, 110 S.Ct. 1595. Congress enacted RFRA, through its § 5 power to enforce the Due Process Clause, to overcome *Smith's* holding. Accordingly, RFRA provided that laws that substantially burdened the exercise of religion must be justified as the least restrictive means of furthering a compelling state interest. *See* 42 U.S.C. § 2000bb–1.

The Court in *City of Boerne* considered whether legislative resurrection of the "compelling interest" test—"the most demanding test known to constitutional law," — U.S. at ——, 117 S.Ct. at 2171constituted a permissible exercise of Congress's § 5 power. The Court examined the legislative record and found that Congress did not enact this test in response to a history of unconstitutional conduct: "RFRA's legislative record lacks examples of modern instances of generally applica-

ble laws passed because of religious bigotry." *Id.* at ——, 117 S.Ct. at 2169. The Court concluded that RFRA was "so out of proportion" to the burdens on religion that Congress identified and attempted to prevent that the statute could not be understood as an effort to respond to, or prevent, unconstitutional behavior. *See id.* at ——, 117 S.Ct. at 2170. Rather, the Court determined that RFRA "attempt[s] a substantive change in constitutional protections," *id.,* such that the statute went beyond attempting to "enforce" an established constitutional right. Because "Congress's power under § 5 ... extends only to 'enforc[ing]' the provisions of the Fourteenth Amendment," *id.* at ——, 117 S.Ct. at 2164 (alteration in original), the Court struck down RFRA as unconstitutional. *See id.* at ——, 117 S.Ct. at 2172.

This analysis clarified what had been an unsettled question in regard to Congress's authority to enforce the Fourteenth Amendment. The Court rejected the substantive, or "ratchet" theory, expressed most forcefully in *Katzenbach v. Morgan,* 384 U.S. 641, 653–56, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966), which maintained that Congress could expand the substantive rights contained in § 1 of the Fourteenth Amendment even when the courts had explicitly refused to recognize the existence of such rights.[11] In rejecting this theory, the Court explained, "Congress does not enforce a constitutional right by changing what the right is. It has been given the power 'to enforce,' not the power to determine what constitutes a constitutional violation." *City of Boerne,* — U.S. at ——, 117 S.Ct. at 2164.

▇▇▇▇ Accordingly, in order to determine whether legislation is appropriate under Congress's enforcement power, we must consider whether it deters or remedies unconstitutional conduct. *See id.* at ——, 117 S.Ct. at 2163. However, legislation that sat-

11. The Court in *City of Boerne* asserted that "[a]ny suggestion that Congress has a substantive, non-remedial power under the Fourteenth Amendment is not supported by our case law." — U.S. at ——, 117 S.Ct. at 2167. It did recognize that Morgan "could be interpreted as acknowledging a power in Congress to enact legislation that expands the rights contained in § 1 of the Fourteenth Amendment." *Id.* at ——, 117 S.Ct. at 2168. However, the Court believed that this was "not a necessary interpretation, ... or even the best one." Rather, the Court asserted that the legislation at issue in Morgan could be justified as a reasonable attempt by Congress to combat unconstitutional discrimination. *See id.*

isfies this consideration may be appropriate "even if in the process it prohibits conduct which is not itself unconstitutional." *See id.* For an act to be appropriate remedial legislation, "[t]here must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end. Lacking such a connection, legislation may become substantive in operation and effect." *Id.* at —, 117 S.Ct. at 2164.

■ The University posits that the Equal Pay Act, by not requiring proof of discriminatory intent, necessarily proscribes some state action that is constitutional. Because of this feature, the University argues that the Equal Pay Act constitutes "substantive" legislation. This contention is not without some appeal.[12] The Supreme Court's recognition that Congress's "remedial" power "extends only to enforc[ing] the provisions of the Fourteenth Amendment" is difficult to reconcile with the Court's statement that remedial legislation may be appropriate "even if in the process it prohibits conduct which is not itself unconstitutional." *City of Boerne,* — U.S. at — — —, 117 S.Ct. at 2163–64. The Supreme Court recognized this difficulty, stating that "the line between measures that remedy or prevent unconstitutional actions and measures that make a substantive change in the governing law is not easy to discern." *Id.* at 2164, 117 S.Ct. 2157. Nonetheless, "the distinction exists and must be observed." *Id.* Therefore, we reject the University's contention that the Equal Pay Act

automatically constitutes inappropriate legislation merely because it proscribes some constitutional conduct.

Instead, we consider whether the Equal Pay Act satisfies *City of Boerne's* "proportionality and congruence" test. *See id.* In this context, it is significant that Congress inquired into the extent of sex-based wage discrimination in the workplace prior to enacting the Equal Pay Act.[13] See, e.g., S.Rep. No. 176, 88th Cong., 1st Sess., 1 (1963). The Supreme Court has recognized that

> Congress' purpose in enacting the Equal Pay Act was to remedy what was perceived to be a serious and endemic problem of employment discrimination in private industry—the fact that the wage structure of "many segments of American industry has been based on an ancient but outmoded belief that a man, because of his role in society, should be paid more than a woman even though his duties are the same."

*Corning Glass Works v. Brennan,* 417 U.S. 188, 195, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974) (quoting S.Rep. No. 176, supra). Congress accordingly had substantial justification to conclude that pervasive discrimination existed whereby women were paid less than men for equal work. We accord these findings substantial deference, given that "Congress must have wide latitude," *City of Boerne,* — U.S. at —, 117 S.Ct. at 2164, to determine where the line lies between substantive and remedial measures. These legislative find-

---

12. The Supreme Court's distinction between substantive and remedial. legislation has not been applied uniformly in the courts of appeals. In the context of Eleventh Amendment challenges to antidiscrimination statutes, the distinction has resulted in disarray. *Compare Kimel v. Florida Bd. of Regents,* 139 F.3d 1426, 1433, 1448 (11th Cir.1998) (holding, in a splintered opinion, that the ADEA does not validly abrogate the States' Eleventh Amendment immunity), *with Goshtasby v. Board of Trustees of Univ. of Illinois,* 141 F.3d 761, 772 (7th Cir.1998) (holding that the ADEA is a proper exercise of Congress's enforcement power); *compare also Autio v. AFSCME, Local 3139,* 140 F.3d 802, 805 (8th Cir.1998) ("In passing the [Americans with Disabilities Act (ADA)], Congress was not attempting to make a substantive constitutional change."), *with Coolbaugh v. Louisiana,* 136 F.3d 430, 440 (5th Cir.1998) (Smith, J., dissenting) ("Both RFRA and the ADA

purport to establish greater rights for individuals against the states by increasing the measure of judicial scrutiny for conflicting state actions to a level higher than the Supreme Court has found appropriate under the Fourteenth Amendment."), *petition for cert. filed,* 66 U.S.L.W. 3783, — U.S. —, — S.Ct. —, — L.Ed.2d — (U.S. May 28, 1998) (No. 97–1941).

13. Legislative findings in this context may be helpful to our inquiry. As the Supreme Court has recognized, however, they are not required. *See City of Boerne,* — U.S. at — — —, 117 S.Ct. at 2169–70 ("Judicial deference, in most cases, is based not on the state of the legislative record Congress compiles but 'on due regard for the decision of the body constitutionally appointed to decide.' ") (quoting *Oregon v. Mitchell,* 400 U.S. 112, 207, 91 S.Ct. 260, 27 L.Ed.2d 272 (1970) (Harlan, J.)).

ings stand in contrast to RFRA, in which the legislative record was devoid of any reference to modern examples of the kind of unconstitutional conduct purportedly targeted by the legislation. See *City of Boerne,* — U.S. at — – —, 117 S.Ct. at 2169–70.

Moreover, in examining the provisions of the Equal Pay Act, we do not believe that their scope is out of proportion to the harms that Congress sought to redress. See *Goshtasby,* 141 F.3d at 772. In order to establish a claim under the Equal Pay Act, a plaintiff must demonstrate that the employer pays different wages to employees of the opposite sex "for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." 29 U.S.C. § 206(d)(1). This, however, does not automatically establish liability. Rather, employers enjoy three specific affirmative defenses: that the wage differentials are due to either (i) a seniority system, (ii) a merit system, or (iii) a system that measures wages by quantity or quality of production. *Id.* In addition, employers may avoid liability under a catch-all provision that affords a defense when the differential is "based on any other factor other than sex." *Id.* § 206(d)(1)(iv); *see also Fallon v. Illinois,* 882 F.2d 1206, 1211 (7th Cir.1989). The broad scope of these defenses protects employers from liability when the employer has sound reasons for wage disparities ("any other factor other than sex"), but they allow for liability when no such reasons exist. We believe that these statutory provisions are reasonably tailored to remedy intentional gender-based wage discrimination. *Cf. United States v. City of Chicago,* 573 F.2d 416, 423 (7th Cir.1978) (holding that Congress's extension of Title VII's protections to government employees was "clearly rationally related to and consistent with 'the letter and spirit' of the Fourteenth Amendment"). As we recognized in *Goshtasby,* the fact that the statute's sweep includes some constitu-

tional conduct is not fatal. See 141 F.3d at 423 (quoting *City of Boerne,* — U.S. at — —, 117 S.Ct. at 2163). The Equal Pay Act, unlike RFRA, does not redefine the substantive rights of the Fourteenth Amendment, nor are its provisions out of proportion to the harms that Congress intended to remedy and deter.[14]

Thus, in light of the above, we conclude that Congress validly abrogated the University's Eleventh Amendment immunity from suit under the Equal Pay Act.

### III. The Civil Rights Act of 1991

█ Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, was amended by the Equal Employment Opportunity Act of 1972, Pub.L. No. 92261, 78 Stat. 253, to expressly abrogate the States' Eleventh Amendment immunity. See *Fitzpatrick v. Bitzer,* 427 U.S. 445, 448–49, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976). Title VII's definition of "person" was amended to include "governments, governmental agencies, [and] political subdivisions," 42 U.S.C. § 2000e(a), and the term "employer" is defined as a "person" who also satisfies other statutory conditions not relevant here. *Id.* § 2000e(b). The statute also defines the term "respondent" to include an employer. *Id.* § 2000e(n). Finally, the 1972 amendments included within the statute's definition of "employee" those individuals "subject to the civil service laws of a State government, governmental agency or political subdivision." *Id.* § 2000e(f). Title VII's enforcement provisions state that "a civil action may be brought against the respondent named in the charge ... by the person claiming to be aggrieved," *id.* § 2000e–5(f)(1), and that "each United States district court ... shall have jurisdiction of actions brought under this subchapter." *Id.* § 2000e–5(f)(3). These provisions make it unmistakably clear, as the Supreme Court recognized in *Fitzpatrick,* that Congress intended to abrogate

---

**14.** In a footnote to its Equal Pay Act argument, the University's Brief states: "To the extent that plaintiffs assert disparate impact claims under Title VII, those claims raise identical Fourteenth Amendment concerns." If the University is attempting to argue that, in light of *City of Boerne,* we should overrule City of Chicago and Liberales, it has waived this argument. *See, e.g.,*

*United States v. Berkowitz,* 927 F.2d 1376, 1384 (7th Cir.1991) ("We repeatedly have made clear that perfunctory and undeveloped arguments ... are waived (even where those arguments raise constitutional issues)."). At any rate, in light of the foregoing discussion, we see no reason to revisit those cases without the benefit of full briefing.

the States' Eleventh Amendment immunity under Title VII. The University argues, however, that the Civil Rights Act of 1991(CRA)—which for the first time provided a compensatory damages remedy for Title VII plaintiffs who proved intentional discrimination, *see* 42 U.S.C. § 1981a—does not contain a similar expression of legislative intent to abrogate.

The plain language of § 1981a shows that Congress intended to create an additional remedy for Title VII violations, as opposed to a separate cause of action. The statute provides:

> In an action brought by a complaining party under § 706 ... of the Civil Rights Act of 1964 [42 U.S.C. § 2000e–5] against a respondent who engaged in unlawful intentional discrimination ... prohibited under § 703, 704, or 717 of the Act [42 U.S.C. §§ 2000e–2, 2000e–3, 2000e–16], and provided that the complaining party cannot recover under [42 U.S.C. § 1981], the complaining party may recover compensatory and punitive damages as allowed in subsection (b) of this section, in addition to any relief authorized by § 706(g) of the Civil Rights Act of 1964 [42 U.S.C. § 2000e–5(g) ], from the respondent.

42 U.S.C. § 1981a(a)(1). As the University concedes, Congress incorporated Title VII's definitional provisions into § 1981a. These definitional provisions establish that the States, as potential "respondents," *see supra* at 717, are within the class of employers from which a "complaining party" under § 1981a may recover compensatory damages, and they are not elsewhere expressly excluded from that class. *See* 42 U.S.C. § 1981a(a)(1) & (b)(2). Section 1981a defines the term "complaining party" to include "a person who may bring an action or proceeding under title VII of the Civil Rights Act of 1964." *Id.* § 1981a(d)(1)(A). Thus, a "complaining party" in an "action brought" under Title VII may be entitled to compensatory damages by showing that a "respondent" (which includes State governments) engaged in unlawful intentional discrimination. Further, as we have indicated, Title VII confers jurisdiction upon the federal courts for "actions brought" under its provisions. *See* 42 U.S.C. § 2000e–

5(f)(3). Therefore, we conclude that the Civil Rights Act of 1991 merely creates an additional remedy for actions brought under Title VII. *See, e.g., Williams v. Banning,* 72 F.3d 552, 553 (7th Cir.1995) ("Congress amended Title VII in the Civil Rights Act of 1991 to permit victims of unlawful intentional discrimination to collect compensatory and punitive damages...."). It does not, as the University contends, create a distinct cause of action that would require its own statement of abrogation. When Congress authorized compensatory damages claims against Title VII respondents (who may be sued in federal court), it expressed its intent to authorize such claims against the States.

Our conclusion is further buttressed by Congress's explicit exclusion of the States as respondents that may be subject to punitive damages claims under Title VII. *See* 42 U.S.C. § 1981a(b)(1) ("A complaining party may recover punitive damages under this section against a respondent (other than a government, government agency or political subdivision)...."). No similar exclusion exists with respect to claims for compensatory damages. *See id.* § 1981a(b)(2). Congress would have had no need to provide this explicit exception to the CRA's expanded remedies unless it understood the remainder of those remedies—including compensatory damages claims-to apply to the States. Indeed, "a limitation of liability is nonsensical unless liability existed in the first place." *Pennsylvania v. Union Gas Co.,* 491 U.S. 1, 13, 109 S.Ct. 2273, 105 L.Ed.2d 1 (1989), *overruled on other grounds by Seminole Tribe v. Florida,* 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996). Thus, we believe that the language of § 1981a makes clear Congress's desire to add remedies to Title VII (including a compensatory damages remedy against the States), rather than a separate cause of action. Under Title VII, the abrogation of the States' Eleventh Amendment immunity is settled. *See Fitzpatrick,* 427 U.S. at 448–49, 96 S.Ct. 2666.

For the foregoing reasons, we reject the University's assertion of Eleventh Amendment immunity with respect to both the Equal Pay Act and the Civil Rights Act of

1991. We therefore affirm the decision of the district court.