# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

Nos. 05-2203 & 05-2447

TIG INSURANCE COMPANY,
individually and as subrogee
of Illinois State University,

*Plaintiff-Appellant,*

*v.*

GIFFIN WINNING COHEN & BODEWES,
P.C., an Illinois professional corporation,
and CAROL HANSEN POSEGATE,

*Defendants-Appellees.*

_____

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 00 C 2737—**Samuel Der-Yeghiayan**, *Judge.*

_____

ARGUED FEBRUARY 8, 2006—DECIDED APRIL 7, 2006

_____

Before MANION, KANNE, and EVANS, *Circuit Judges.*

EVANS, *Circuit Judge.* TIG Insurance Company appeals the dismissal of its malpractice case against the Giffin Winning law firm[1] and one of its attorneys, Carol Hansen Posegate.

_____

[1]  Its full name is Giffin, Winning, Cohen & Bodewes, P.C.

To explain the malpractice claim we must reach back to the underlying lawsuit, in which Giffin Winning, at least for a time, represented Illinois State University (ISU) in a class-action, gender-discrimination lawsuit brought by several female professors. In the suit, *Varner v. Illinois State University*, which was assigned to District Judge Michael M. Mihm, the plaintiffs contended that they were being paid less than male professors and that ISU retaliated against female professors who complained about the discrimination. Their attorney was Joel Bellows. TIG was ISU's liability insurer at the time and it paid the attorney fees which are at the heart of the present malpractice action; TIG, in turn, was reimbursed by its reinsurers.

The malpractice alleged in the present case arose out of discovery problems in the *Varner* case. The major problem involved Giffin Winning's failure to produce three documents called gender equity studies (two of which are at issue here) in their response to a discovery request. The response was signed in October 1996. A month later the *Varner* case was stayed. Soon thereafter, the law firm of Latham & Watkins filed an appearance on behalf of ISU and essentially took control of ISU's defense, though Giffin Winning remained of record. Latham had an attorney-client relationship with ISU's insurer TIG. Giffin Winning did not.

The facts show that Giffin Winning received two gender equity studies from ISU in 1994—while the *Varner* case was still pending before the Equal Employment Opportunity Commission. Two years later, when the law firm received the second request for documents, the subject of the October 1996 response at issue here, they routed the request to William Gorrell, the former executive director for Information Systems and the head of the Planning Policy department at ISU. He did not at that time forward the studies to Giffin Winning for production and the law firm did not produce them on its own. On this point, Judge Mihm later

said that Gorrell was the one who "dropped the ball entirely."

During the stay in the *Varner* case, Bellows talked with Gorrell, who by then was no longer employed by ISU and had his own lawsuit pending against the school for wrongful termination. He independently provided Bellows with the gender equity studies. He also executed an affidavit detailing particulars of a "planning policy database" on which he said the studies were based.

Once the stay was lifted, Bellows confronted Latham with the studies. (The Latham firm was now representing ISU). Bellows demanded that ISU turn over the database on which he alleged the studies were based. Apparently thinking the best defense is a good offense, Latham's first response apparently was to point fingers, saying Bellows had also not adequately complied with discovery requests. Also at this time, Latham began preparing a motion to disqualify Bellows for improperly soliciting privileged information from Gorrell.

For his part, Bellows filed a motion for sanctions against both ISU and Giffin Winning, in part based on the failure to produce the gender equity studies. As relevant here, Bellows' contention in his motion for sanctions was not simply that the studies were not produced. After all, he now had the studies. Rather, he claimed that the gender equity studies were not produced because of a conspiracy to hide the "Planning Policy database." To have produced the studies, he argued, "would have alerted the *Varner* plaintiffs to the existence of the databases . . . ."

We now arrive at the essence of the case—the pivotal facts about the database. At a 4-day hearing on the pending motions, Gorrell testified that the database contained variables relevant to the issue of gender equity and was maintained in a format which enabled a user to prepare comparative studies. He testified that the gender equity

studies were prepared from this database. He said he had done one of the studies himself, though he also said he had never personally accessed the database. The actual data processing, he said, was done by his research assistant, Anna Wells, and her preparation of the data for his 1994 study would have taken her no more than a day or two using the database:

> Q   How long did it take Anna Wells to compile the information for the 1994 study?
>
> A   It could be done in a day or two.

That apparently was news to Wells. She testified that she did not use any database in compiling the data.

> Q   Ms. Wells, when you collected the information reflected in these tables, was there a single source that you could go to to collect all the information reflected in the tables?
>
> A   No.
>
> Q   Was there a single database maintained by the Planning Policy department that contained all of the information reflected in these tables?
>
> A   No.

She used hard copy (probably the same 279 banker boxes of material which had, in fact, been produced to Bellows), and it took her "a few weeks, several weeks" to locate the information and format it for use. Why? Because, as Judge Mihm found, there was no database and never had been:

> I don't believe that the plaintiffs have ever established the existence of the kind of database that I thought was being alleged here, that there was some button at ISU that could be punched that would involve a print-out of all this information. That clearly is not true . . . .

The nonexistence of the database—which Bellows said there was an alleged conspiracy to hide—is not seriously contested.

Nevertheless, Judge Mihm sanctioned Giffin Winning $10,000 for discovery lapses, a sanction which was later vacated. Judge Mihm, however, wisely denied Bellows' request for a default judgment based on the failure to produce the gender equity studies. He remarked that "I don't believe it was appropriate—but even if I had ordered that, I think that would have been reversed on appeal." In addition, although he denied Latham's motion to disqualify Bellows because of his contact with Gorrell, Judge Mihm sanctioned Bellows $10,000 as well. Ultimately, the *Varner* case was settled; mercifully, we think.[2]

We now get to the present malpractice action that TIG filed against Giffin Winning in which the damages TIG alleges are the attorney fees it paid Latham to defend against the sanction motion—a whopping $1.2 million, give or take, for the work of 27 attorneys and various paralegals. It seems that when Latham said it took the motion seriously, it meant it. As we said, TIG paid the bill and was subsequently reimbursed by its reinsurers.

Several issues swirl around in this appeal from the district court's grant of summary judgment for Giffin Winning. Two involve strictly legal issues: Does our holding in *Garris v. Schwartz*, 551 F.2d 156 (7th Cir. 1977), preclude a legal malpractice action in which the damages are solely attorney fees, and does the collateral source rule apply in this case, thus precluding TIG's recovery of

---

[2] The case has a lengthy appellate history, having proceeded twice to the U.S. Supreme Court. *Varner v. Illinois State University*, 972 F. Supp. 458 (C.D. Ill. 1997), *affirmed*, 150 F.3d 706 (7th Cir. 1998), *vacated*, 528 U.S. 1110 (2000), *on remand*, 226 F.3d 927 (7th Cir. 2000), *cert. denied*, 533 U.S. 902 (2001).

damages for which it has already been compensated. Another issue involves the striking of expert testimony. Others involve whether summary judgment was proper, specifically whether there was sufficient evidence of damages to survive summary judgment and whether the issue of causation could be resolved on summary judgment.

Our focus will be on the issue of causation. We emphasize, however, that, by concentrating on that single issue, we do not imply anything at all about the application of the collateral source rule in these circumstances or the continued viability of *Garris v. Schwartz*. We are deliberately skipping the larger issue of whether a malpractice claim can be based on attorney fees (the question posed by *Garris v. Schwartz*). What we are saying is that, assuming such a cause of action exists (which we are assuming only for the present discussion), TIG's claim would fail as a matter of law.

The elements of a legal malpractice action in Illinois are well-settled. They are: "(1) the existence of an attorney-client relationship that establishes a duty on the part of the attorney; (2) a negligent act or omission constituting a breach of that duty; (3) proximate cause; and (4) damages." *Lopez v. Clifford Law Offices*, 841 N.E.2d 465, 470-471 (Ill. App. 2005), citing cases. A legal malpractice case is similar to any other negligence claim, and traditional principles apply. *Id.* Proximate cause describes two distinct requirements—cause in fact and legal cause. *First Springfield Bank & Trust v. Galman*, 720 N.E.2d 1068 (Ill. 1999); *see also Abrams v. City of Chicago*, 811 N.E.2d 670 (Ill. 2004). Cause in fact exists only if the defendant's conduct was a "material element and a substantial factor in bringing about the injury." *Abrams*, at 675. Legal cause, on the other hand, is largely a question of foreseeability. The relevant inquiry is whether "the injury is of a type that a reasonable person would see *as a likely result* of his or her conduct." (Emphasis in original.) *Abrams*, at 675, quoting

*Galman*. The occurrence must have been "reasonably" foreseeable: "Not what actually happened, but what the reasonably prudent person would then have foreseen as likely to happen, is the key to the question of reasonableness." *Cunis v. Brennan*, 308 N.E.2d 617, 619 (Ill. 1974), quoting 2 Law of Torts (1956), sec. 16.9 at 929.

This is not the same as (but, in this case, necessarily a bit difficult to distinguish from) a determination as to whether the fees themselves are reasonable. For purposes of proximate cause, if the fees do not reflect work reasonably, foreseeably related to the negligence alleged in the case, it does not matter that in some other sense they might be "reasonable." We draw this distinction in response to TIG's argument, relying on *Medcom Holding Co. v. Baxter Travenol Laboratories, Inc.*, 200 F.3d 518 (7th Cir. 1999), that because the fees were paid, they are prima facie reasonable. In this situation, we find the argument breathtaking, say nothing of irrelevant. But in any case, TIG overstates the holding of *Medcom*. The case states that "[i]f the bills were paid, this strongly implies that they meet market standards." At 520. It goes on to state that an indemnity agreement for "commercially-reasonable fees no matter how the bills are stated" should be enforced. At 520. But we emphasized the modifier—"Notice the qualification: commercially-reasonable fees." At 521. Upon remand, the district court was instructed to ask whether the fees were reasonable; that is, "were they fees that commercial parties would have incurred and paid knowing that they had to cover the outlay themselves?" TIG perhaps overstates the principle set out in *Medcom*; that, however, is not our present concern.

Proximate cause is the issue on which this case falters. Having said that, we recognize that the Illinois courts indicate that proximate cause should ordinarily be decided not as a matter or law, but by a trier of fact. *Lopez, supra*.

However, in a situation in which it is clear as a matter of law that the injury could not have been foreseeable, Illinois courts have upheld summary judgment on the issue. *Abrams, supra*. The situation before us is such a case.

The fundamental negligence allegedly committed by Giffin Winning in the *Varner* case was a failure to produce documents—especially gender equity studies—pursuant to a discovery request. The attorneys had routed the request to Gorrell, who was at that point still employed by ISU. He did not forward the studies to the attorneys. However, the attorneys had copies of the studies, which they also failed to produce. This is a clear breakdown of the discovery process, which we infer was not going at all smoothly on either side of this case.

In this all-too-common situation, the question for us is whether it would be reasonably foreseeable that a failure to produce these documents would result in the injury alleged here. Could the attorneys foresee that Gorrell, who failed to produce the documents when they turned the request over to him, would then, after he became disgruntled with ISU, independently provide the documents to Bellows? Beyond that, would reasonable people foresee that Gorrell would mislead Bellows about a database which did not exist? Would reasonable people then think that, upon hearing Gorrell's story, Bellows' first impulse would be to move for sanctions including default judgment in the case? Would reasonable people foresee that, next, a large law firm, apparently thinking of Judge Mihm as a bit trigger-happy, would jump into high gear out of fear of default judgment and launch an army of 27 attorneys, plus paralegals, to defend against the possibility that Judge Mihm might grant default judgment on the basis of an alleged conspiracy to hide something which does not exist? In other words, was the *Latham* response to a failure to produce documents and the resulting injury foreseeable?

We think it was not as a matter of law. Our point can be illustrated by a very different sort of negligence action. In *Abrams*, the city failed to send an ambulance for a woman, Abrams (of course), who was in labor. A friend, who then drove her to the hospital, ran a red light and collided with a car driven by a drug-and-alcohol-impaired driver with a suspended license. Abrams was seriously injured and spent 2 weeks in a coma; sadly, her baby died. The court found, however, that as a matter of law there was no proximate cause. The city could not have foreseen the situation that unfolded. Perhaps a bit callously, the court remarked that "[m]illions of women in labor make it safely to the hospital each year by private transportation." *Abrams,* 811 N.E.2d at 677.

It is also true—though less tragically so—that countless failures to produce documents occur in the federal courts every year. That is not a good thing. But we are not at a point at which it is foreseeable that such a failure will spawn a million-dollar bill for attorney fees. If it were, litigation would become more of a blood sport than it already is. Lawyers would be even more obsessive about irrelevant and tedious details. No good could come of it.

There is, in fact, nothing which distinguishes the failure to produce in this case with countless others. Judge Mihm himself made this point in response to Bellows' argument that this was the worst discovery abuse he had ever seen. Judge Mihm said:

> But you said in your 34 years of practice this was the most shocking thing you had ever seen in terms of this discovery issue. I wonder what kind of practice you've had if that's the case because, boy, in the scheme of things, I've seen things 50 times worse than this.

What is foreseeable as a result of a failure to produce documents is the reasonable procedure set out in Civil Rule

of Civil Procedure 37, which provides for sanctions only after other reasonable efforts to work out disagreements fail. It may be that, as Judge Mihm also said, that did not happen enough in this case. But ISU and Giffin Winning could hardly be expected to foresee all this trouble over a phantom database. Why would they? It was ISU's alleged database and Giffin Winning was representing ISU at the time. They knew of no database; they were hiding no database; there was no database. For Giffin Winning's carelessness in failing to produce documents (which Bellows had in his possession), the sanction of $10,000 might well have been sustained on appeal. But as a matter of law, the injury alleged here was not reasonably foreseeable.

Accordingly, the judgment of the district court dismissing this case is AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*