COOK, Senior District Judge,
concurring in part and dissenting in part:
I.
I concur with my brethren that the decision below with respect to the Americans With Disabilities Act (ADA), 42 U.S.C. §§ 12101-12213, and Section 504 of the Rehabilitation Act of 1973 (Rehabilitation Act), 29 U.S.C. § 794, must be reversed because this circuit’s prior decision in Kimel v. State of Florida Board of Regents, 139 F.3d 1426 (11th Cir.1998), is controlling.[1]
*1221 II.
However, I respectfully dissent from the holding that the States’ Eleventh Amendment immunity was not validly abrogated by the provisions of the Family Medical Leave Act of 1993 (FMLA), 29 U.S.C. §§ 2601-2654, which are at issue in the case brought by the Appellant, Patricia Garrett, against the Appellee, the Board of Trustees for the University of Alabama in Birmingham (UAB).
A.
The outcome of this appeal is governed by the analytical framework that the Supreme Court has established with regard to the Eleventh Amendment grant of immunity to the states from federal court litigation, and the abrogation thereof pursuant to Section Five of the Fourteenth Amendment. The Eleventh Amendment reads:
[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.
“While the Amendment by its terms does not bar suits against a State by its own citizens, this Court has consistently held that an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another State.” Edelman v. Jordan, 415 U.S. 651, 662-63, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). The Eleventh Amendment also immunizes state agents and state instrumentalities. Regents of Univ. of Cal. v. Doe, 519 U.S. 425, 429, 117 S.Ct. 900, 137 L.Ed.2d 55 (1997). However, the Eleventh Amendment does not prohibit federal courts from entertaining private actions against state officers for injunctive relief. See Ex Parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908).
The Supreme Court considered the scope of the states’ Eleventh Amendment immunity in Seminole Tribe of Florida v. Florida, 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996). In the course of that decision, the Court validated a two-part test to determine “whether Congress has abrogated the States’ sovereign immunity ... first, whether Congress has ‘unequivocally expresse[d] its intent to abrogate the immunity,’ and second, whether Congress has acted ‘pursuant to a valid exercise of power.’ ” Id. at 55, 116 S.Ct. 1114 (citation omitted) (quoting Green v. Mansour, 474 U.S. 64, 68, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985)). Although the Court overruled Pennsylvania v. Union Gas Co., 491 U.S. 1, 109 S.Ct. 2273, 105 L.Ed.2d 1 (1989), by holding that the Interstate Commerce Clause, U.S. Const. Art. I, § 8, cl. 3, did not empower Congress to unilaterally abrogate the Eleventh Amendment’s grant of state immunity, it recognized that Section Five of the Fourteenth Amendment was a valid means of doing so. Seminole Tribe, 517 U.S. at 59-66, 116 S.Ct. 1114. Section Five of the Fourteenth Amendment provides that “[t]he Congress shall have power to enforce, by appropriate legislation, the provisions of this article,” U.S. Const. amend. XIV, § 5, which includes the guarantee that “[n]o State shall make or enforce any law which shall ... deny to any person within its jurisdiction the equal protection of the laws,” U.S. Const. amend. XIV, § 1.
The Supreme Court has provided guidance concerning the circumstances in which Congress may validly invoke the Fourteenth Amendment’s Equal Protection Clause to abrogate the immunity granted to states by the Eleventh Amendment. The test is whether the statute (1) may be regarded as an enactment to enforce the Equal Protection Clause, (2) is plainly adapted to that end, and (3) is not prohibited by, but is consistent with, the letter and spirit of the Constitution. Katzenbach v. Morgan, 384 U.S. 641, 651, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966).
Recently, the Supreme Court in City of Boerne v. Flores, 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), added constraints to this test by emphasizing that *1222 the power granted to Congress by Section Five of the Fourteenth Amendment was (1) an enforcement or remedial authority, as opposed to a license to substantively define the Fourteenth Amendment’s protections, and (2) limited by a requirement of congruence or proportionality between the relevant legislation and the injury sought to be remedied or prevented. Although the Supreme Court did not so specify, it appears that these considerations apply to the second and third Morgan factors.
Flores presented the issue of whether the Religious Freedom Restoration Act of 1993 (RFRA) was validly promulgated under Congress’ Fourteenth Amendment power to enforce the Free Exercise Clause. Through the RFRA, Congress had invoked its power under Section Five of the Fourteenth Amendment in an effort to counteract the Supreme Court’s decision in Employment Division, Department of Human Resources of Oregon v. Smith, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), which held that neutral, generally applicable laws may be applied to inhibit religious practices even when not supported by a compelling governmental interest. Flores, 521 U.S. at 512-14, 117 S.Ct. 2157. Reviewing Fourteenth Amendment jurisprudence, the Supreme Court emphasized that Congress is granted an enforcement, or remedial, power under the Fourteenth Amendment, but that:
[t]he design of the Amendment and the text of § 5 are inconsistent with the suggestion that Congress has the power to decree the substance of the Fourteenth Amendment’s restrictions on the States. Legislation which alters the meaning of the Free Exercise Clause cannot be said to be enforcing the Clause. Congress does not enforce a constitutional right by changing what the right is. It has been given the power “to enforce,” not the power to determine what constitutes a constitutional violation.
Flores, 521 U.S. at 519, 117 S.Ct. 2157. The Court found that (1) “[t]he remedial and preventive nature of Congress’ enforcement power, and the limitation inherent in the power, were confirmed in our earliest cases on the Fourteenth Amendment,” and further (2) “[a]ny suggestion that Congress has a substantive, non-remedial power under the Fourteenth Amendment is not supported by our case law.” Id. at 524, 527, 117 S.Ct. 2157. The limits to Congress’ Fourteenth Amendment powers are necessary because:
[i]f Congress could define its own powers by altering the Fourteenth Amendment’s meaning, no longer would the Constitution be “superior paramount law, unchangeable by ordinary means.” It would be “on a level with ordinary legislative acts, and, like other acts, ... alterable when the legislature shall please to alter it.” Under this approach, it is difficult to conceive of a principle that would limit congressional power. Shifting legislative majorities could change the Constitution and effectively circumvent the difficult and detailed amendment process contained in Article V.
Id. at 529, 117 S.Ct. 2157 (citation omitted) (quoting Marburg v. Madison, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803)).
The Supreme Court recognized that, as with many constitutional doctrines, application of these abstract principles to specific facts can be difficult.
While the line between measures that remedy or prevent unconstitutional actions and measures that make a substantive change in the governing law is not easy to discern, and Congress must have wide latitude in determining where it lies, the distinction exists and must be observed.
Flores, 521 U.S. at 519-20, 117 S.Ct. 2157. The Flores majority emphasized the necessity, when making these distinctions, of assuring a “congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end” because “[Hacking such a connection, legislation may become [impermissibly] substantive in operation and effect.” Id. *1223 at 520, 117 S.Ct. 2157. This theme of proportionality between the statutory means and the ends to be achieved was repeated throughout the opinion, see id. at 530, 533, 117 S.Ct. 2157, and was indeed the determinative factor in the Court’s analysis of the RFRA, see id. at 532, 117 S.Ct. 2157. Thus, the Court held that Congress exceeded its enforcement or remedial powers under the Fourteenth Amendment when it enacted the RFRA because
RFRA cannot be considered remedial, preventive legislation, if those terms are to have any meaning. RFRA is so out of proportion to a supposed remedial or preventive object that it cannot be understood as responsive to, or designed to prevent, unconstitutional behavior. It appears, instead, to attempt a substantive change in constitutional protections ....
... Sweeping coverage ensures its intrusion at every level of government, displacing laws and prohibiting official actions of almost every description and regardless of subject matter. RFRA’s restrictions apply to every agency and official of the Federal, State, and local Governments. RFRA applies to all federal and state law, statutory or otherwise, whether adopted before or after its enactment. RFRA has no termination date or termination mechanism. Any law is subject to challenge at any time by any individual who alleges a substantial burden on his or her free exercise of religion.
The substantial costs RFRA exacts, both in practical terms of imposing a heavy litigation burden on the States and in terms of curtailing their traditional general regulatory power, far exceed any pattern or practice of unconstitutional conduct under the Free Exercise Clause.... Simply put, RFRA is not designed to identify and counteract state laws likely to be unconstitutional because of their treatment of religion.
Id. at 532, 534, 117 S.Ct. 2157. In sum, because of the necessity for proportionality between the injury and the statutory remedy, the Supreme Court concluded that there had been an insufficient showing that religious bias was a pervasive enough problem to warrant the sweeping applicability of the RFRA. See id. at 530-32, 117 S.Ct. 2157.
B.
The FMLA sets national minimum standards for family and medical leave in employment. In specified situations, such as when oneself or a family member requires care due to a serious health problem or pregnancy-related issue, the FMLA requires covered employers to provide twelve weeks of unpaid leave per year. See 29 U.S.C. § 2612(a). Employers must place an employee returning from such leave into the position that had been held when the leave commenced, or to an equivalent position. 29 U.S.C. § 2614(a). Inhibiting covered employees from exercising their FMLA rights, or retaliating against them for doing so, is prohibited. See 29 U.S.C. § 2615(a).
In the present appeal, the District Court ruled that Congress lacked authority under the Fourteenth Amendment to make the States subject to a private damages suit in federal court for asserted FMLA violations.[2] Garrett v. Board of Trustees of University of Alabama, 989 F.Supp. 1409, 1412 (N.D.Ala.1998). Although it acknowledged that the FMLA had an explicit goal of assuring equal protection, the court below simply considered those statutory declarations “self-serving” and “insufficient to accomplish [the FMLA’s] purpose.” Garrett, 989 F.Supp. at 1412. In my opinion this holding was erroneous because Congress validly abrogated the *1224 States’ Eleventh Amendment immunity when it passed the FMLA.
(1)
I would answer the first Seminole Tribe inquiry, which asks whether Congress unequivocally expressed its intent to abrogate the immunity granted to the states by the Eleventh Amendment, Seminole Tribe, 517 U.S. at 55, 116 S.Ct. 1114, in the affirmative. This intent “must be obvious from ‘a clear legislative statement,’ ” id. (quoting Blatchford v. Native Village of Noatak, 501 U.S. 775, 786, 111 S.Ct. 2578, 115 L.Ed.2d 686 (1991)), and “ ‘unmistakably clear in the language of the statute,’ ” Dellmuth v. Muth, 491 U.S. 223, 227-28, 109 S.Ct. 2397, 105 L.Ed.2d 181 (1989) (quoting Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 242, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985)). “[E]vidence of congressional intent must be both unequivocal and textual.” Dellmuth, 491 U.S. at 230, 109 S.Ct. 2397. The FMLA satisfies this test.
The FMLA defines an “employer” to “include[] any ‘public agency,’ as defined in section 203(x) of this title.” 29 U.S.C. § 2611 (4)(A)(iii). Section 203(x), which is actually part of the Fair Labor Standards Act (FLSA), defines “public agency” as including “the government of a State or political subdivision thereof; ... a State, or a political subdivision of a State” 29 U.S.C. § 203(x). Similarly, the word “employee” is defined to encompass “any individual employed by an employer,” and the FMLA further specifies that “[i]n the case of an individual employed by a public agency,” the term refers, with certain exceptions not relevant here, to “any individual employed by a State, [or] political subdivision of a State.” 29 U.S.C. §§ 2611(3), 203(e)(1), 203(e)(2)(C). These FMLA provisions unmistakably intend to subject state employers to the Act’s protections.
Any doubt as to whether Congress intended to authorize damages to be claimed against the states pursuant to a private FMLA suit in federal court, which would necessarily require the abrogation of the Eleventh Amendment’s immunity, is erased by the FMLA’s enforcement provisions. One of those provides that any covered employer violating the Act will be subject to a suit for damages by any covered employee. 29 U.S.C. § 2617(a)(1)(A). Importantly, another states that:
[a]n action to recover the damages or equitable relief prescribed in paragraph (1) may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction by any one or more employees.
29 U.S.C. § 2617(a)(2).
UAB argues that these textual provisions do not sufficiently demonstrate a congressional intention to abrogate the Eleventh Amendment. According to UAB, the statutory cross-referencing that is necessary to discern that a “public agency” includes state governmental employers is fatal to such a finding. However, this does not provide a principled basis for disposing of the issue. For example, as UAB recognizes, in Seminole Tribe the Supreme Court found a clear legislative intent to abrogate the Eleventh Amendment based on repeated references to the state and the remedies made available against it in numerous subsections of a particular federal statute. Seminole Tribe, 517 U.S. at 56-57, 116 S.Ct. 1114 (reviewing subsections (A)(1), (B)(ii)(II), (B)(iii), (B)(iv), (B)(v), (B)(vi), and (B)(vii) of 25 U.S.C. § 2710(d)(7)); see also Fitzpatrick v. Bitzer, 427 U.S. 445, 448-49 & n. 2, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976). The reason why numerous subsections of one statute, when read together, could be deemed sufficient to indicate an intent to abrogate, but cross-references to various statutes could not, is a mystery. Such an approach would violate the familiar command that statutes are to be read as a whole. “We believe it fundamental that a section of a statute should not be read in isolation from the context of the whole Act, and that in fulfilling our responsibility in interpreting legislation, we must not be guided by a single sentence or member of a sentence, but (should) look to the provi *1225 sions of the whole law, and to its object and policy. ” Richards v. United States, 369 U.S. 1, 11, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962) (footnotes and internal quotations omitted). An exception to this general principle is not warranted out of deference for the Eleventh Amendment and the important role that sovereignty plays in the federal system. As UAB acknowledges, Congress is not required to use the “magic words” in order to effectively overcome the Eleventh Amendment. Varner v. Illinois State Univ., 150 F.3d 706, 711 (7th Cir.1998); Ussery v. Louisiana, 150 F.3d 431, 435 (5th Cir.1998); see also EEOC v. Wyoming, 460 U.S. 226, 243 n. 18, 103 S.Ct. 1054, 75 L.Ed.2d 18 (1983).
UAB asserts that the FMLA’s explicit grant of federal court jurisdiction to enforcement suits by the Secretary of Labor for either damages or injunctive relief, 29 U.S.C. §§ 2617(b)(2), (d), supports its position that § 2617(a)(2) only created a cause of action for damages in federal court against public agencies that are not shielded from such actions by the Eleventh Amendment because otherwise the latter would have equally explicit language as the former. Essentially, UAB argues that an abrogation of the Eleventh Amendment may occur only when an act of Congress contains an explicit and separate statutory grant of jurisdiction in federal court for private damages suits against the states. That contention is but a repackaging of the already discredited “magic words” argument. The plain language of § 2617(a)(2) is perfectly clear: “[a]n action to recover ... damages., may be maintained against any employer (including a public agency) in any Federal ... court of competent jurisdiction by any one or more employees.” The fact that § 2617(a)(2) also grants state courts jurisdiction over FMLA suits, as well as federal court jurisdiction over suits seeking equitable relief, does not provide a basis for ignoring its language that an employee may bring a private cause of action for damages in federal court. UAB’s argument that Blatchford supports its reasoning must be rejected. In Blatchford, the Supreme Court ruled that the Eleventh Amendment was not abrogated based on a general grant of federal jurisdiction over “all civil actions.” 501 U.S. at 786, 111 S.Ct. 2578. By contrast, § 2617(a)(2) clearly does more than merely provide a general grant of jurisdiction in federal court.
Two cases that UAB heavily relies upon do not support the conclusion that Congress failed to unequivocally demonstrate its intent to abrogate the Eleventh Amendment through the FMLA. The first is Dellmuth.[3] That decision implied that a clear provision concerning the parties which are subject to suit under the Education of the Handicapped Act might suffice as an expression of intent to abrogate the Eleventh Amendment. Dellmuth, 491 U.S. at 231, 109 S.Ct. 2397. As set forth above, the FMLA unquestionably contains such a provision, which clearly includes state employers within its coverage. 29 U.S.C. §§ 2617(a)(1)(A), (a)(2).
The second case that UAB emphasizes is Kimel. According to UAB, Kimel, where this circuit held that the Age Discrimination in Employment Act (ADEA) did not abrogate the Eleventh Amendment, has effectively answered the same issue with respect to the FMLA because the two Acts contain similar relevant statutory language. But UAB overstates the holding in Kimel, where only one member of the panel, Judge Edmondson, held that Con *1226 gress had failed to sufficiently indicate its intent to abrogate the Eleventh Amendment with the ADEA. Kimel, 139 F.3d at 1430-33. Another member of the panel, Judge Cox, although agreeing with the conclusion that the states’ Eleventh Amendment immunity was not abrogated by the ADEA, expressly declined to rule on whether a sufficient intent to abrogate was evident in that Act. Kimel, 139 F.3d at 1444-45. The third panel member, Chief Judge Hatchett, dissented on this issue, concluding that “Congress effectively abrogated the states’ sovereign immunity under the Eleventh Amendment.” Kimel, 139 F.3d at 1434-35. Thus, Kimel does not control on the issue of intent to abrogate.
Moreover, Judge Edmondson’s position in Kimel is unpersuasive because it accepts that a sufficient intent to abrogate cannot be discerned from reading in concert separate statutory provisions in an Act of Congress.
This statutory structure does not provide the clarity needed to abrogate States’ constitutional right to sovereign immunity. For abrogation to be unmistakably clear, it should not first be necessary to fit together various sections of the statute to create an expression from which one might infer an intent to abrogate. Although we make no definite rule about it, the need to construe one section with another, by its very nature, hints that no unmistakable or unequivocal declaration is present.
Kimel, 139 F.3d at 1431; accord Driesse v. Florida Bd. of Regents, 26 F.Supp.2d 1328, 1331-32 (M.D.Fla.1998). As explained above, such an approach unjustifiably creates an Eleventh Amendment exception to the axiom that federal Acts are to be read as a whole. Judge Edmondson also appears to have applied a more stringent textual requirement than is generally understood to apply to this first Seminole Tribe factor.
No unequivocal expression of an intent to abrogate immunity is unmistakably clear in the ADEA. No reference to the Eleventh Amendment or to States’ sovereign immunity is included. Nor is there, in one place, a plain, declaratory statement that States can be sued by individuals in federal court. To me, an intent on the part of Congress to abrogate the States’ constitutional right to immunity [in the ADEA] is not sufficiently clear to be effective under Eleventh Amendment jurisprudence.
Kimel, 139 F.3d at 1430-31. No less of a strict textualist than Justice Scalia has expressly disavowed such an approach. “I join the opinion of [four other Justices of] the Court, with the understanding that [their] reasoning does not preclude congressional elimination of sovereign immunity in statutory text that clearly subjects States to suit for monetary damages, though without explicit reference to state sovereign immunity or the Eleventh Amendment.” Dellmuth, 491 U.S. at 233, 109 S.Ct. 2397 (Scalia, J., concurring). For all these reasons, Kimel does not control on the issue of whether Congress sufficiently indicated an intent to abrogate the Eleventh Amendment when it passed the FMLA.
Importantly, Thomas v. Louisiana, 534 F.2d 613, 614 & n. 4 (5th Cir.1976),[4] lends support to the Garrett’s position that Congress intended to abrogate Eleventh Amendment immunity through passage of the FMLA. As the Fifth Circuit recognized in Thomas, Congress amended the Fair Labor Standards Act (FLSA) by adding the following language for the express purpose of superseding a Supreme Court holding that the FLSA lacked a clear intent to abrogate:[5]
*1227 [a]ction to recover such liability may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated.
Thomas, 534 F.2d at 614 & n. 4 (quoting 29 U.S.C. § 216(b) (1970)). This language is almost identical to that used by Congress in 29 U.S.C. § 2617(a)(2) of the FMLA. Moreover, when reviewing the current language from § 216(b) of the FLSA,[6] which remains substantially identical after further amendment, the Second Circuit Court of Appeals held that it “evince[d] a clear intent to abrogate the States’ sovereign immunity by allowing suit in federal courts.” Close v. State of New York, 125 F.3d 31, 36 (2d Cir.1997). Therefore, when taken in conjunction with the FMLA’s statutory provisions that identify state employees as potential plaintiffs and their state employers as potential defendants, I believe that the best result is to conclude that the FMLA contains an unmistakably clear intent to abrogate the states’ Eleventh Amendment immunity.
(2)
In my opinion, the second Seminole Tribe factor, which asks whether Congress was acting pursuant to a valid exercise of power when it promulgated the FMLA, Seminole Tribe, 517 U.S. at 55, 116 S.Ct. 1114, is also satisfied. Congress stated that the FMLA was being passed:
(4) to accomplish the purposes described [herein] in a manner that, consistent with the Equal Protection Clause of the Fourteenth Amendment, minimizes the potential for employment discrimination on the basis of sex by ensuring generally that leave is available for eligible medical reasons (including maternity-related disability) and for compelling family reasons, on a gender-neutral basis; and
(5) to promote the goal of equal employment opportunity for women and men, pursuant to such clause.
29 U.S.C. § 2601(b). This explicit invocation of the Fourteenth Amendment’s Equal Protection clause is sufficient to establish that Congress was acting pursuant to Section Five of the Fourteenth Amendment when it passed the FMLA.[7] See Morgan, 384 U.S. at 652, 86 S.Ct. 1717. As the Supreme Court made clear in Seminole Tribe, 517 U.S. at 59-60, 116 S.Ct. 1114, Section Five authorizes Congress to validly abrogate the Eleventh Amendment.
Therefore, the analysis proceeds to whether the FMLA was a valid exercise of Congress’ Fourteenth Amendment power, and applies the three-part test from Morgan. Given that Congress has explicitly invoked the goal of equal protection when *1228 passing the FMLA, and supported that with extensive legislative findings regarding how the FMLA is designed to guard against gender and disability discrimination,[8] which are unquestionably goals of the Fourteenth Amendment, see United States v. Virginia, 518 U.S. 515, 533, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996); Weinberger v. Wiesenfeld, 420 U.S. 636, 652, 95 S.Ct. 1225, 43 L.Ed.2d 514 (1975), City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 446-47, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985), it meets the first Morgan factor because it may be regarded as an enactment to enforce the Equal Protection Clause. See Wilson-Jones v. Caviness, 99 F.3d 203, 210 (6th Cir.1996) (the simplest way to meet first Morgan test is “for Congress to declare explicitly that the legislation is passed to enforce Fourteenth Amendment rights”).
The more difficult question is whether the FMLA satisfies the second and third Morgan factors, which require that the legislation be (1) plainly adapted to enforce the Equal Protection Clause of the Fourteenth Amendment, and (2) consistent with, and not prohibited by, the letter and spirit of the Constitution. These considerations are constrained by the Flores principles that the legislation must (1) be enforcing or remedial in nature, rather than an attempt to make a substantive change to the protections the Fourteenth Amendment affords, and (2) have a congruence and proportionality between the injury to be prevented and the means adopted to that end. The District Court summarily concluded that the FMLA failed these tests, without discussing the Morgan factors, and referred to the Flores guidelines that illuminate them only in passing.
The tertiary reliance by [Garrett] on the FMLA implicates the same Congressional reasoning and authority that Congress employed in enacting the ADA and the Rehab Act, with the same result. Although the FMLA does not refer to Section 5 of the Fourteenth Amendment, it does speak of accomplishing its purpose of promoting family integrity “in a manner that, consistent with the Equal Protection Clause of the Fourteenth Amendment, minimizes the potential for employment discrimination on the basis of sex” and that it will “promote the goal of equal employment opportunity for women and men.” 29 U.S.C. § 2601(b)(4) and (5). These statutory expressions are no more than self-serving declarations of the > kind criticized in Flores. Although they do, perhaps, give the FMLA a better chance at asserting control over the FMLA-pro-scribed employment practices by states than does similarly self-serving language found in the ADA and the Rehab Act, this court finds this statutory language in the FMLA insufficient to accomplish its purpose.
Garrett, 989 F.Supp. at 1412.
Contrary to the district court’s holding, the FMLA is a valid exercise of Congress’ Fourteenth Amendment powers because it is a justified enforcement measure to address sex and disability discrimination. Congress passed the FMLA in response to employers’ sex discrimination in the offering of employee leave time based upon presuppositions about the roles of men and women in families and as caretakers, and of the presupposed need of women and the disabled to time off due to pregnancies and health problems, respectively. There can be no question that it is unconstitutional under the Fourteenth Amendment for a state to discriminate on the basis of sex stereotypes, see Virginia, 518 U.S. at 533, 116 S.Ct. 2264; Weinberger, 420 U.S. at 643, 95 S.Ct. 1225, or that the Fourteenth Amendment’s protections extend to the disabled, see City of Cleburne, 473 U.S. at 446-47, 105 S.Ct. 3249.
Nevertheless, during its legislative inquiry Congress found that, due to societal perceptions regarding family roles, employers who offered leave time to women discriminated against men with regal'd to *1229 that employment benefit, either by not offering it, granting a shorter amount than was made available to women, or discouraging men from taking it.[9] Such discrimination against men is unconstitutional, “[A] father, no less than a mother, has a constitutionally protected right to the companionship, care, custody, and management of the children he has sired and raised.” Weinberger, 420 U.S. at 652, 95 S.Ct. 1225 (internal quotation and citation omitted).
By the same token, Congress also found that women experienced discrimination related to leave time, in that employers’ perceptions that women served as caretakers and therefore were more likely to ask for leave time contributed to a decreased willingness to hire women in the first instance or promote them.[10] In addition, women *1230 were rendered more vulnerable to this form of discrimination based on employer concerns that they would need leave time for pregnancies,[11] while the disabled suffered from it as well due to employer fears that the health problem would require time off or preclude a return to work after a medical absence.[12] Particularly relevant in this Eleventh Amendment context is that Congress found that public sector employees were suffering comparable sex discrimination problems with regard to leave time as employees in the private sector.[13] Thus, through the FMLA Congress unquestionably sought to protect Fourteenth Amendment Equal Protection interests in response to a demonstrably pervasive discrimination problem.[14] Consequently, the concern in Flores, 521 U.S. at 530-32, 117 S.Ct. 2157, that the RFRA was not implemented in response to a serious or demonstrated need to protect against religious bigotry is inapplicable to the FMLA.
Further, the FMLA’s remedial measures are plainly adapted to enforce the interest in combatting sex and disability discrimination in employment and are consistent with, and not prohibited by, the letter and spirit of the constitution, within the Flores constraints of enforcement and proportionality. By setting a minimum standard for family leave for all eligible employees — male and female — the FMLA extends to male workers the types of leave benefits more often available to working women. Just as importantly, by providing male workers with the opportunity for parental leave, the FMLA “help[s] to eliminate the stereotype — no longer valid in today’s working world — that women are exclusively responsible for childcare.”[15] In addition, by authorizing leave for all serious health conditions rather than only for pregnancy related disabilities, the FMLA discourages discrimination against *1231 women of childbearing age.[16]
UAB, by emphasizing the affirmative obligations that the FMLA places on employers and suggesting that this represents a substantive change in the protections the Fourteenth Amendment assures, argues that the FMLA is not merely remedial.[17] However, Congress determined that a mere negative imperative upon employers, in the form of a law prohibiting them from discriminating in the granting of employee leave time on the basis of sex, was insufficient because it had already proven inadequate under Title VII, which already mandated that employers who granted parental leave had to do so equally between the sexes, see 42 U.S.C. § 2000e-2(a), and persisted despite protections such as the Pregnancy Discrimination Act, 42 U.S.C. § 2000e(k), and 42 U.S.C. § 1983.[18] Moreover, the Title VII experience also taught Congress that a mere prohibition was impracticable because it placed too great of an enforcement burden upon employees: the costs of legal challenges to asserted violations were prohibitive, and for those who did not have this problem the time spent litigating negated any eventual positive result.[19]
This experience justifies Congress’ choice to impose affirmative obligations upon employers through the FMLA and, contrary to UAB’s position, distinguishes the FMLA from the concerns the Supreme Court in Flores used to invalidate the RFRA. For example, as even Flores recognized, broad and aggressive legislation in the voting rights context to enforce the constitutional guarantees against voting discrimination, including an affirmative duty to submit changes in electoral practices to the Department of Justice for clearance,[20] were within Congress’ Fourteenth Amendment powers because they were (1) aimed at actions “with a long history” as “ ‘notorious means to deny and abridge voting rights on racial grounds,’ ” and (2) “necessary given the ineffectiveness of the existing voting rights laws and the slow costly character of case-by-case litigation.” Flores, 521 U.S. at 526, 533, 117 S.Ct. 2157 (emphasis added and citations omitted) (quoting South Carolina v. Katzenbach, 383 U.S. 301, 355, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966) (Black, J., concurring and dissenting)). Congress found that an analogous situation existed with respect to sex discrimination in the offering of employee leave time. Given the *1232 ineffectiveness of prior attempts to assure compliance in this realm with the Fourteenth Amendment’s guarantee of equal protection, Congress was within its powers to take more aggressive remedial measures.
Congress, unlike any State or political subdivision, has a specific constitutional mandate to enforce the dictates of the Fourteenth Amendment. The power to “enforce” may at times also include the power to define situations which Congress determines threaten principles of equality and to adopt prophylactic rules to deal with those situations.
City of Richmond v. J.A. Croson Co., 488 U.S. 469, 490, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989).
The Supreme Court in Flores warned that congressional invocations of the Fourteenth Amendment could lack the congruence necessary to their validity depending on the degree, and justification therefor, of their “intrusion into the States’ traditional prerogatives and general authority to regulate for the health and welfare of their citizens.” Flores, 521 U.S. at 534, 117 S.Ct. 2157. The Thomson court appears to have invoked that principle by concluding that the FMLA represents “an inappropriate interference into a traditional area of state sovereignty which runs afoul of the spirit of the Constitution and the concepts of federalism which it contains.” Thomson, 5 F.Supp.2d at 581; see also Driesse, 26 F.Supp.2d at 1334. However, Thomson and Driesse erred by failing to recognize that, although the regulation of employee leave time might be an area traditionally reserved to the states, Congress’ belief that its prior efforts to prohibit unconstitutional sex discrimination in employee leave time, such as through Title VII and its later amendment by the Pregnancy Discrimination Act, 42 U.S.C. §§ 1983, 2000e(k), had been unsuccessful justified its conclusion that a blanket, fixed guarantee of leave time was necessary to “minimize[] the potential for employment discrimination on the basis of sex by ensuring generally that leave is available for eligible medical reasons (including maternity-related disability) and for compelling family reasons, on a gender-neutral basis.” 29 U.S.C. § 2601(b)(4); see also 29 U.S.C. § 2601(a)(6) (“employment standards that apply to one gender only have serious potential for encouraging employers to discriminate against employees and applicants for employment who are of that gender”); S.Rep. No. 103-3, at 16 (1993), reprinted in 1993 U.S.C.C.A.N. 3, 18 (“A law providing special protection to women or any defined group, in addition to being inequitable, runs the risk of causing discriminatory treatment. S. 5, by addressing the needs of all workers, avoids such a risk”); H.R.Rep. No. 100-511, pt. 2, at 26 (1988)[21].
Legislation which deters or remedies constitutional violations can fall within the sweep of Congress’ enforcement power even if in the process it prohibits conduct which is not itself unconstitutional and intrudes into “legislative spheres of autonomy previously reserved to the States.”
Flores, 521 U.S. at 518, 117 S.Ct. 2157 (quoting Fitzpatrick, 427 U.S. at 455, 96 S.Ct. 2666).
Given Congress’ legislative findings as to the pervasive problem of sex discrimination in the offering of employee leave time, and lack of success with prior efforts to effectuate anti-discriminatory legislation on that issue, the FMLA’s limited measures assure its congruence with the prob *1233 lem that it seeks to remedy and deter. The FMLA (1) applies only to firms employing fifty or more employees (which comprise approximately five per cent of businesses)[22] for at least twenty weeks during a calendar year,[23] (2) protects only employees who have worked for a covered employer for at least one year, during which they must have worked at least 1,250 hours,[24] (8) guarantees only unpaid leave,[25] (4) requires covered employees to give thirty days advance notice of foreseeable leave requests, and in that instance mandates a reasonable effort not to unduly disrupt the employer’s operations,[26] and (5) allows employers to require the certification of serious medical conditions.[27] Thus, the FMLA certainly can be said to comply with its stated goal of assuring employee protections “in a manner that accommodates the legitimate interests of employers.” 29 U.S.C. § 2601(b)(2). Also significant for purposes of the Eleventh Amendment is that Congress found that compliance with the FMLA would be no more burdensome for state, as opposed to private, employers.[28] Nevertheless, it demonstrated a concerted effort to minimize the burden that the FMLA did impose on state employers by excluding from its coverage state employees who hold certain high-ranking or sensitive positions. 29 U.S.C. §§ 2611(3), 203(e)(2)(C). The FMLA is therefore substantively distinguishable from the RFRA, which applied without restriction to all governmental acts, whether federal, state, or local, Flores, 521 U.S. at 532-34, 117 S.Ct. 2157.
Further, although the district courts in Thomson, 5 F.Supp.2d at 580, McGregor, 18 F.Supp.2d at 209, and Driesse, 26 F.Supp.2d at 1334, found fault with the FMLA on the basis that it imposes a significant financial burden on state employers, this assertion was based on mere speculation and is contrary to Congress’ finding that family and medical leave is cost-effective because it results in decreased costs related to hiring, training, turnover, and absenteeism.[29] “When Congress makes findings on essentially factual *1234 issues ... those findings are of course entitled to a great deal of deference, inasmuch as Congress is an institution better equipped to amass and evaluate the vast amounts of data bearing on such an issue.” Walters v. National Ass’n of Radiation Survivors, 473 U.S. 305, 330 n. 12, 105 S.Ct. 3180, 87 L.Ed.2d 220 (1985).
Importantly, the FMLA contains a mechanism for reviewing its effectiveness and the burden that it imposes on employers by creating a Commission on Leave to study actual costs and benefits of the Act and report to Congress two years after enactment. 29 U.S.C. § 2632. This represents another distinguishing feature from the RFRA, which the Supreme Court criticized for having no time or enforcement limitations.[30] Flores, 521 U.S. at 532-33, 117 S.Ct. 2157. Contrary to the speculation concerning costs in which the Thomson, McGregor, and Driesse courts indulged, the Commission has found that the vast majority of work sites (between 89.2% and 98.5%) reported little or no cost from FMLA compliance in four broad survey areas.[31]
Contrary to the position taken in McGregor, 18 F.Supp.2d at 209-10, the FMLA’s failure to require a specific finding of discriminatory intent on the part of the employer is not necessarily sufficient to invalidate it. Legislation passed by Congress to combat discrimination through enforcement of the Equal Protection Clause does not always require a showing of discriminatory animus. See Alexander v. Choate, 469 U.S. 287, 295-97, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985). Congress, pursuant to the Fourteenth Amendment, may “prohibit laws with discriminatory effects in order to prevent ... discrimination in violation of the Equal Protection Clause.” Flores, 521 U.S. at 529, 117 S.Ct. 2157. This is because, as it is generally understood, the Fourteenth Amendment empowers Congress to enact appropriate legislation establishing more exacting requirements than those minimum safeguards provided in the amendment. See Fullilove v. Klutznick, 448 U.S. 448, 477, 100 S.Ct. 2758, 65 L.Ed.2d 902, (1980) (plurality opinion); City of Rome, 446 U.S. at 177, 100 S.Ct. 1548; Morgan, 384 U.S. at 648-51, 86 S.Ct. 1717.
A construction of § 5 that would require a judicial determination that the enforcement of the state law precluded by Congress violated the Amendment, as a condition of sustaining the congressional enactment, would depreciate both congressional resourcefulness and congressional responsibility for implementing the Amendment. It would confine the legislative power in this context to the insignificant role of abrogating only those state laws that the judicial branch was prepared to adjudge unconstitutional, or of merely informing the judgment of the judiciary by particularizing the “majestic generalities” of. § 1 of the Amendment.
Morgan, 384 U.S. at 648-49, 86 S.Ct. 1717 (footnote omitted).
Given Congress’ findings about the continuing pervasive problem of sex discrimination in the offering of employee leave time despite its previous legislative attempts to combat that problem through less burdensome legal prohibitions, the FMLA cannot be considered “so out of proportion to a supposed remedial or preventive object that it cannot be understood as responsive to, or designed to prevent, unconstitutional behavior.” Flores, 521 U.S. at 532, 117 S.Ct. 2157. The widespread nature of the problem that Congress hoped to address through the FMLA, and prior unsuccessful legislative efforts to provide effective protections, justify Congress’ imposition of an affirmative duty upon covered employers, particularly *1235 because § 5 legislation does not require “egregious predicates.” Flores, 521 U.S. at 533, 117 S.Ct. 2157. Rather, the FMLA is at the least broadly appropriate “in light of the evil presented,” based on the “ ‘historical experience ... it reflects,’ ” Flores, 521 U.S. at 525, 530, 117 S.Ct. 2157 (quoting South Carolina v. Katzenbach, 383 U.S. 301, 308, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966)), particularly since it contains the types of measured limitations on coverage and enforcement that “tend to ensure Congress’ means are proportionate to ends legitimate under § 5,” Flores, 521 U.S. at 533, 117 S.Ct. 2157. Consequently, given that the FMLA is not subject to the concerns the Supreme Court espoused in Flores, this tribunal should defer to Congress’ judgment that the Act is an appropriate measure to protect the citizenry from unconstitutional sex discrimination in employment. “It is for Congress in the first instance to ‘determin[e] whether and what legislation is needed to secure the guarantees of the Fourteenth Amendment,’ and its conclusions are entitled to much deference.” Flores, 521 U.S. at 536, 117 S.Ct. 2157 (quoting Morgan, 384 U.S. at 651, 86 S.Ct. 1717).
III.
Accordingly, for the reasons that I have explained above, I concur to the extent-that the decision below, as it respects the ADA and Section 504 of the Rehabilitation Act, must be reversed due to this circuit’s intervening decision in Kimel v. State of Florida Board of Regents, 139 F.3d 1426 (11th Cir.1998).
However, I would hold that Congress validly abrogated the States’ Eleventh Amendment immunity through passage of the FMLA, and thus respectfully dissent on that issue.

. See also Seaborn v. State of Florida Dep’t Corrections, 143 F.3d 1405, 1407 (11th Cir.1998).

. Three other district courts that have considered the issue have reached the same result. Driesse v. Florida Bd. of Regents, 26 F.Supp.2d 1328 (M.D.Fla.1998); McGregor v. Goord, 18 F.Supp.2d 204 (N.D.N.Y.1998); Thomson v. Ohio State Univ. Hosp., 5 F.Supp.2d 574 (S.D.Ohio 1998).

. In Dellmuth, the Supreme Court concluded that three provisions of the Education of the Handicapped Act (EHA) did not suffice to indicate a clear intent to abrogate the Eleventh Amendment: (1) the preamble, which provided that it was in the national interest for the federal government to assist the states in the subject area in question, (2) a statute, which allowed an aggrieved party to bring a civil action in federal court under the EHA, and (3) a 1987 amendment, which clarified that a provision reducing attorney's fees would not apply if a state agency unreasonably protracted the final resolution of the litigation or a violation of the EHA had occurred. Dellmuth, 491 U.S. at 228, 231-32, 109 S.Ct. 2397.

. Fifth Circuit Court of Appeals (Fifth Circuit) decisions issued before October .1, 1981 are binding precedent in the Eleventh Circuit. Bonner v. City of Prichard, 661 F.2d 1206, 1209-11 (11th Cir.1981) (enbanc).

. The Supreme Court had so ruled in Employees of the Department of Public Health & Welfare v. Department of Public Health & Welfare, 411 U.S. 279, 93 S.Ct. 1614, 36 L.Ed.2d 251 (1973).

. "An action to recover the liability prescribed in either of the preceding sentences may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated.”

. Additionally, the implementing regulations are as explicit that Congress acted pursuant to the authority granted it by the Fourteenth Amendment.
... It was intended that the Act accomplish [its] purposes ... in a manner consistent with the Equal Protection Clause of the Fourteenth Amendment in minimizing the potential for employment discrimination on the basis of sex, while promoting equal employment opportunity for men and women.
29 C.F.R. § 825.101(a). The legislative history also indicates that Congress was acting under the Fourteenth Amendment’s Equal Protection Clause. S.Rep. No. 103-3, at 16 (1993), reprinted in 1993 U.S.C.C.A.N. 3, 18.
Further, the legislative history of the FMLA indicates that Congress was drawing on its Commerce Clause powers as well, in addition to the Fourteenth Amendment's Due Process Clause. Id. However, since the Commerce Clause does not authorize Congress to abrogate the Eleventh Amendment's grant of immunity, Seminole Tribe, 517 U.S. at 59-66, 116 S.Ct. 1114, it is irrelevant to Garrett’s appeal save for providing an independent basis for validating the FMLA’s substantive provisions.

. 29 U.S.C. §§ 2601(a), (b)(4) & (5); 29 C.F.R. § 825.101(a); S.Rep. No. 103-3, at 5-12 (1993), reprinted in 1993 U.S.S.C.A.N. 3, 7-14; H.R.Rep. No. 103-8 (1993).

. The House of Representatives found that “[djespite the apparent conflict with Title VII of the Civil Rights Act, only 37 percent of the[] companies extend[ed] parental leave to fathers and often on a different (and less extended) basis than to mothers.” H.R.Rep. No. 100-511, pt. 2, at 24 (1988); see also S.Rep. No. 103-3, at 14-15 (1993), reprinted in 1993 U.S.C.C.A.N. 3, 17 (noting 37% availability of "maternity” leave at businesses with more than 100 workers, compared to only 18% availability of "paternity” leave); 138 Cong. Rec. S12,095, S12,096 (daily ed. August 11, 1992) (remarks of Sen. Kennedy) (noting 1990 Bureau of Labor Statistics study which found that “only 18 percent of fathers at medium and large firms are covered by an unpaid paternity leave policy, and only 6 percent of fathers at small firms had the right to take leave”); The Parental and Medical Leave Act of 1987: Hearings Before the Subcomm. on Children, Families, Drugs and Alcoholism of the Senate Comm. on Labor and Human Resources, Part 2, 100th Cong. 536 (1987) [hereinafter Hearings: Leave Act of 1987, Part 2 ] (statement of Professor Susan Deller Ross, Georgetown University Law Center) ("[Tjhere are a number of studies ... in which it's shown that employers in this country that are giving family leaves to their workers are not giving it non-discriminatorily, they are, by and large, giving it only to women, not to men. It’s fairly flagrant discrimination.”); The Parental and Medical Leave Act of 1986: Joint Hearing Before the Subcomm. on Labor Management Standards of the House Comm, on Education & Labor, 99th Cong. 146, 147 (1986) [hereinafter Hearings: Leave Act of 1986 ] (statement of Washington Council of Lawyers) ("Parental leave for fathers ... is rare.... Where child-care leave policies do exist, men ... receive notoriously discriminatory treatment in their request for such leave.”); id. at 99, 101 n. 2 (statement of Women’s Legal Defense Fund, citing Catalyst, Report on a National Study of Parental Leaves, 30, 37 (1986)) ("[B]ecause of sex discrimination against men, some working fathers may find it more difficult than their female counterparts to be permitted to accommodate family responsibilities without suffering adverse employment consequences. In a recent study by Catalyst, an independent research firm, 51.8% of companies surveyed reported that they give parental leave to mothers, but only 37.0% reported that they provide such leave to fathers — even though such a sex-base differential clearly violates existing law.”); id. at 21 (statement of Thomas Donahue for AFL-CIO) (drawing on national experience with union contracts and corroborating lack of policies permitting working fathers to take time off for family responsibilities). See generally Schafer v. Board of Public Education, 903 F.2d 243 (3d Cir.1990) (male public school teacher challenged school board's policy of granting one year of child-rearing leave to female employees only); Knussman v. State of Maryland, 16 F.Supp.2d 601 (D.Md.1998) (male police officer challenged stale's presumption that the mother is the "primary care giver” entitled to additional leave); Chavkin v. Santaella, 81 A.D.2d 153, 439 N.Y.S.2d 654 (1981) (male probation officer challenged city probation department's practice of allowing only female employees to use accrued sick leave to extend infant care leave).

. 138 Cong. Rec. H8226, H8227 (daily ed. September 10, 1992) (remarks of Rep. Hayes) ("Too often women experience the nightmare of going in to their employer with the news that they are pregnant. Although they are valued employees, up to the moment they became pregnant, suddenly they find themselves unwanted.... They are offered an unacceptable choice: Keep a job or raise a family.”); Hearings: Leave Act of 1987, Part 2, supra note 9, at 173-74 (statement of Peggy Montes, Mayor's Commission on Women's Affairs, City of Chicago) ("Job opportunities for [women with children] are limited, and they often miss pay increases and promotions. The lack of uniform parental and medical leave policies in the work place has created an environment where discrimination is rampant. Very often we are contacted by women workers who are at risk of losing their jobs or have lost them because they are pregnant, [or] gave birth to a child....”); Hear *1230 ings: Leave Act of 1986, supra note 9, at 100 (statement of Women’s Legal Defense Fund).

. Hearings: Leave Act of 1986, supra note 9, at 100 (statement of Women’s Legal Defense Fund) ("Historically, denial or curtailment of women's employment opportunities has been traceable directly to the pervasive presumption that women are mothers first, and workers second. This prevailing ideology about women’s roles has in turn justified discrimination against women when they are mothers or mothers-to-be.’’); id. at 36, 42 n. 48 (statement of National Women's Political Caucus, pointing to amicus brief filed with the Supreme Court by the ACLU in California Federal Savings & Loan Ass’n v. Guerra, 479 U.S. 272, 275, 107 S.Ct. 683, 93 L.Ed.2d 613 (1987)) (stating provision of special legal protections "put women, not on a pedestal, but in a cage”; "[t]he assumption that women will become pregnant and leave the labor market is at the core of the sex stereotyping resulting in unfavorable disparate treatment of women in the workplace.”) (internal quotation and citation omitted).

. S.Rep. No. 103-3, at 12 (1993) (testimony regarding employment discrimination against cancer survivors).

. Hearings: Leave Act of 1986, supra note 9, at 30 (statement of Meryl Frank, Yale Bush Center) ("[Pjublic sector leaves don't vary very much from private sector leaves”); id. at 147 (1986) (statement of Washington Council of Lawyers) (“Parental leave for fathers ... is rare.... Where child-care leave policies do exist, men, both in the public and private sectors, receive notoriously discriminatory treatment in their request for such leave.”).

. Relevant here are two arguments UAB raises which may be quickly disposed of. First, UAB asserts that the FMLA is invalid because it does not protect the constitutional rights of members of a "suspect” or "discrete” class. Second, UAB contends that the FMLA is not an effort to remedy discrimination against a class of persons protected by the Fourteenth Amendment because it reaches all employees, regardless of whether they have been subjected to discrimination. As an initial matter, these arguments misunderstand the applicable jurisprudence. The guarantee of equal protection is not enjoyed only by those having a status that results in a higher standard of review. See Cleburne, 473 U.S. at 446-47, 105 S.Ct. 3249 (disabled individuals enjoy equal protection guarantees despite that disability not a quasi-suspect class). Apart from that, UAB’s arguments are incorrect since the FMLA protects against discrimination on the basis of sex and disability, which are protected classes under the Equal Protection clause.

. Hearings: Leave Act of 1986, supra note 9, at 147 (statement of Washington Council of Lawyers).

. S.Rep. No. 102-68, at 35 (1991) ("Because the bill treats all employees who are temporarily unable to work due to serious health conditions in the same fashion, it does not create the risk of discrimination against pregnant women posed by legislation which provides job protection only for pregnancy related disability.”).

. This argument was accepted in Driesse, 26 F.Supp.2d at 1333, McGregor, 18 F.Supp.2d at 208, and Thomson, 5 F.Supp.2d at 579-80, and apparently by the court below, Garrett, 989 F.Supp. at 1412.

. See H.R.Rep. No. 103-8, pt. 1, at 28 (1993); H.R.Rep. No. 100-511, pt. 2, at 22, 24 (1988); Family and Medical Leave Act of 1987: Joint Hearing Before the Subcomm, on Civil Service and the Subcomm. on Compensation and Employee Benefits of the House Comm’n on Post Office and Civil Service, 100th Cong. 31, 32 (1987) (statement of Professor Eleanor Holmes Norton, Georgetown Univ. Law Center) (lack of consistency in employer leave policies based on sex “constitutes a prima facie case of violation of Title VII of the 1964 Civil Rights Act”).
Several district courts have reasoned that since Congress had already established protections against this form of sex discrimination in employment, for example through Title VII actions or causes against state employers under 42 U.S.C. § 1983, the addition of the FMLA's remedies rendered that legislation in-congruent. See Driesse, 26 F.Supp.2d at 1333-34; Thomson, 5 F.Supp.2d at 580. However, since Congress determined that these prior efforts to protect against sex discrimination in the offering of employee leave time had proved unsuccessful, the existence of those preexisting protections cannot serve as a basis to conclude that the FMLA lacks congruence.

. 139 Cong. Rec. H387 (daily ed. February 3, 1993) (remarks of Rep. Ackerman concerning his lawsuit to obtain parental leave).

. See City of Rome v. United States, 446 U.S. 156, 100 S.Ct. 1548, 64 L.Ed.2d 119 (1980).

. "Another significant benefit of the temporary medical leave provided by this legislation is the form of protection it offers women workers who bear children. Since all employees who are temporarily unable to work due to serious health conditions are treated the same under the bill, it does not create the risk of discrimination against pregnant women which is posed by legislation which provides job protection only for pregnant women. Legislation for pregnant women only give employers an economic incentive to discriminate against women in hiring policies; legislation helping all workers equally does not have this effect."

. See 138 Cong. Rec. S 12,095-96 (daily ed. Aug. 11, 1992) (remarks of Sen. Kennedy).

. 29 U.S.C. § 2611(4)(A)(i).

. 29 U.S.C. § 2611(2)(A).

. 29 U.S.C. § 2612(c).

. 29 U.S.C. § 2612(e).

. 29 U.S.C. § 2613.
The extensive series of provisions limiting the scope and burden of the FMLA were noted in the legislative record. 138 Cong. Rec. S12,095-96 (daily ed. August 11, 1992) (remarks of Sen. Kennedy).

. Hearing on H.R. 770, the Family and Medical Leave Act of 1989: Hearing Before the Subcomm. on Labor-Management Relations of the House Comm, on Education and Labor, 101st Cong. 45, 53 (1989) (statement of Gerald McEntee, AFSCME) (based on its experience, AFSCME believed that "the FMLA will not levy significant additional costs on state and local governments and if government at all levels can adopt unpaid leave policies, then so can private industry"); Hearings: Leave Act of 1987, Part 2, supra note 9, at 305 (statement of Roberta Lynch, AFSCME) (belief that FMLA will not impose significant costs on government "is one of the major reasons why the National Conference of State Legislatures, which represents state legislatures in all 50 states, has endorsed this legislation”; noting "this leave policy has presented very little problems for an employer like the State of Illinois").

. S.Rep. No. 103-3, at 12-14, 16-18 (1993), reprinted in 1993 U.S.C.C.A.N. 3, 14-16, 18-21 (noting testimony of small business owners, governmental employers, and chief executive officers, as well as numerous workplace studies by governmental bodies and private institutes; for example, Aetna Life and Casualty Company reportedly saved $2 million in 1991 by reducing employee turnover through implementation of family leave policy, and a study by the Small Business Administration concluded that providing family and medical leave cost employers a minimal $6.70 annually per covered employee); The Family and Medical Leave Act of 1991: Hearing on S. 5 Before the Subcomm. on Children, Family, Drugs and Alcoholism of the Senate Comm. on Labor and Human Resources, 102d Cong. 12, 13, 23, 35, 91 (1991) (noting studies indicating that cost of providing leave would be as inexpensive as $5.30 per employee, on an annual basis).

. The Supreme Court was careful to clarify that "[t]his is not to say, of course, that § 5 legislation requires termination dates, geographic restrictions or egregious predicates.” Flores, 521 U.S. at 533, 117 S.Ct. 2157.

. Commission on Leave, United States Dep’t of Labor, A Workable Balance: Report to Congress on Family and Medical Leave Policies 125-26 (1996).